**Sharan Ann WILLIAMS, Appellant,**

v.

**The STATE of Texas, State.**

**No. 2–03–472–CR.**

Court of Appeals of Texas, Fort Worth.

Oct. 20, 2005.

Rehearing Overruled Feb. 16, 2006.

Anthony C. Odiorne, Wichita Falls, for Appellant.

Barry L. Macha, Criminal Dist. Atty., John Brasher, Lee Ann Haines, Asst. Dist. Attys for Wichita County, Wichita Falls, for Appellee.

Panel F: LIVINGSTON, DAUPHINOT, and GARDNER, JJ.

## OPINION

ANNE GARDNER, Justice.

### INTRODUCTION

Ujeana and Precious Williams, aged seven and eight, died in a fire in the early morning hours of October 5, 2002. A jury convicted their mother, Appellant Sharan Ann Williams, of two counts of reckless injury to a child resulting in serious bodily injury. In two issues on appeal Appellant contends that the evidence is legally and factually insufficient to support her conviction. After careful review of all of the evidence under the applicable standards of review, we affirm.

### BACKGROUND FACTS

At the time of the fire, the girls were spending the night in a structure behind an empty house at 814 Dallas Street in Wichita Falls. Appellant's boyfriend, Herbert Ronald Bowden, was living in the structure temporarily, with permission of the owner, until he could save money for an apartment. The structure was a former duplex, the back part of which had been removed and the back door boarded up. It had no kitchen, bathroom, or utilities. It had not been lived in for some time.

The girls had lived with their grandmother, Zula Mae Scott, in her home on Jalonick Street, since they were babies. On the evening of October 4, 2002, Appellant and Bowden took the children from Zula Mae's house at approximately 5:30 p.m., and walked to the structure where Bowden was staying a few blocks away. Appellant left them with Bowden at approximately 6:30 p.m., first to go to a convenience store for cigarettes, then again at about 8:30 p.m. to go out. Bowden agreed to stay with the girls while she was gone.

Before Appellant left the second time, the girls were put to bed in a back room of the structure, with a candle burning in an aluminum pie plate on the floor, for light. Bowden checked on the sleeping girls during the evening but left the candle burning, and, according to his statements after the occurrence, fell asleep on a couch in the front room adjacent to the bedroom sometime after 11:00 p.m. He awoke sometime after 1:00 a.m., heard screams, and discovered that the room where the girls had been sleeping was engulfed in flames and smoke. Bowden tried but was unable to enter the room to rescue the girls because of the intense flames and heat, and the fire was too far advanced to enter the structure at all by the time the fire depart-

ment responded. Appellant arrived back at the scene as the fire department was extinguishing the blaze.

Bowden and Appellant were each charged with two counts of reckless injury to a child, and their cases were consolidated for trial. The jury convicted Bowden on both counts of recklessly causing serious bodily injury to each child "by leaving [them] in a room without adult supervision with a candle burning." He was sentenced to ten years' confinement on each count to run concurrently, based upon the jury's assessment.[1] Appellant was convicted by the jury on both counts of recklessly causing serious bodily injury to the children by "taking [them] from a house with working utilities to a building where there were no working utilities and leaving [them] in [a] room in that building and leaving a lit candle in the room or by leaving [them] to sleep in the room in the said building without utilities with a burning candle instead of taking [them] to a house with working utilities." The trial court sentenced her to fifteen years' confinement on each count to run concurrently in accordance with the jury's verdict on punishment.

## ELEMENTS OF OFFENSE

The critical inquiry in reviewing both legal and factual evidentiary sufficiency is whether any rational trier of fact would have been justified in finding the essential elements of the offense beyond a reasonable doubt. *McDuff v. State,* 939 S.W.2d 607, 613 (Tex.Crim.App.), *cert. denied,* 522 U.S. 844, 118 S.Ct. 125, 139 L.Ed.2d 75 (1997); *Johnson v. State,* 121 S.W.3d 133, 135 (Tex.App.-Fort Worth 2003, pet. ref'd). We measure sufficiency of the evidence by the elements of the offense as defined by

the hypothetically correct jury charge for the case. *Malik v. State,* 953 S.W.2d 234, 240 (Tex.Crim.App.1997); *Ortiz v. State,* 993 S.W.2d 892, 895 (Tex.App.-Fort Worth 1999, no pet.). Such a charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Gollihar v. State,* 46 S.W.3d 243, 253 (Tex.Crim. App.2001); *Malik,* 953 S.W.2d at 240. The law as authorized by the indictment means the statutory elements of the charged offense as modified by the charging instrument. *Curry v. State,* 30 S.W.3d 394, 404 (Tex.Crim.App.2000).

The statute defining the offense of injury to a child under which Appellant was charged provides;

A person commits an offense if he intentionally, knowingly, recklessly, or with criminal negligence, by act or intentionally, recklessly by omission, causes to a child, elderly individual or disabled individual:

(1) serious bodily injury.

Tex. Penal Code Ann. § 22.04(a)(1) (Vernon 2003).

Injury to a child is a result-oriented offense requiring a mental state that relates not to the charged conduct but to the result of the conduct. *See Alvarado v. State,* 704 S.W.2d 36, 38 (Tex.Crim.App. 1985). It is not enough for the State to prove that the defendant engaged in the alleged conduct with the requisite criminal intent; the State must also prove that the defendant caused the result with the requisite criminal intent. *Lee v. State,* 21 S.W.3d 532, 540 (Tex.App.-Tyler 2000, pet.

---

**1.** Bowden's conviction was affirmed by this court in *Bowden v. State,* 166 S.W.3d 466

(Tex.App.-Fort Worth 2005, pet. filed).

ref'd) (citing *Cook v. State*, 884 S.W.2d 485, 490 (Tex.Crim.App.1994)).

■ Persons act "recklessly" with respect to the result of their conduct when they are aware of, but consciously disregard, a substantial and unjustifiable risk that the result will occur. TEX. PENAL CODE ANN. § 6.03(c) (Vernon 2003). The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint. *Id.* Reckless conduct involves conscious risk creation; that is, the actor was aware of the risk surrounding his conduct or the result of his conduct, but consciously disregarded that risk. *See Montoya v. State*, 744 S.W.2d 15, 29 (Tex. Crim.App.1987), *cert. denied*, 487 U.S. 1227, 108 S.Ct. 2887, 101 L.Ed.2d 921 (1988); *Lewis v. State*, 529 S.W.2d 550, 553 (Tex.Crim.App.1975).

■ Proof of a culpable mental state may be and is most often proven through circumstantial evidence. *Lee*, 21 S.W.3d at 539; *Morales v. State*, 828 S.W.2d 261, 263 (Tex.App.-Amarillo 1992), *aff'd*, 853 S.W.2d 583 (Tex.Crim.App.1993); *see Dillon v. State*, 574 S.W.2d 92, 94 (Tex.Crim.App. [Panel Op.] 1978). Ordinarily the culpable mental state must be inferred from the acts of the accused or the surrounding circumstances, which include not only acts, but words and conduct. *Ledesma v. State*, 677 S.W.2d 529, 531 (Tex.Crim.App.1984); *Morales*, 828 S.W.2d at 263.

Additionally, the State must prove causation, that is, that the person both had the requisite mental state and recklessly caused serious bodily injury to the child by the conduct charged. *See* TEX. PENAL CODE ANN. § 22.04(a)(1). A person is criminally responsible if the result would not have occurred but for his conduct, operating either alone or concurrently with another cause, unless the concurrent cause was clearly sufficient to produce the result and the conduct of the actor clearly insufficient. TEX. PENAL CODE ANN. § 6.04(a) (Vernon 2003).

## REVIEW OF EVIDENCE

Zula Mae Scott, the girls' grandmother, testified that the two girls had lived with her since they were babies.[2] Appellant had recently started helping to watch the children and sometimes stayed at Zula Mae's house with them but was mostly "in and out." Appellant had a key to Zula Mae's house. Zula Mae's house had beds, electricity, a refrigerator, toilet, and gas.

Zula Mae learned from the girls that Appellant and Bowden had been taking them to spend the night at a "vacant" building. She was concerned about the lack of electricity, she said, and talked to Appellant and Bowden about the danger of fire. Zula Mae testified she had told both Appellant and Bowden about two weeks before the fire that "it was too dangerous to be taking them down there and burning candles." According to Zula Mae, Appellant said she always made sure to put the candles out before she went to sleep, and Zula Mae believed that if Appellant had been in the house that night, she would have done so.

Zula Mae testified that, on the evening of October 4, Appellant was supposed to stay with the girls at Zula Mae's house until she got home from work. They had discussed the day before that Appellant was to come stay with the girls. However, neither the girls nor Appellant were home when Zula Mae came home at 5:30. She

---

2. In addition to Precious and Ujeana, who died in the fire, Appellant had three other children, another daughter aged 20, a son aged 18, a son aged 13, and one grandchild.

waited for Appellant to bring the girls home until she got a call that there had been a fire and the girls were dead.

Charles Williams testified he met Appellant when they were growing up in the Projects, and they had one son and the two girls together.[3] Their son, aged 13, lives with him. Williams had known Bowden for a number of years and had worked with him; he knew Bowden was hanging around with Appellant but did not know about the abandoned house until the fire.

Williams testified that he saw the girls about every other weekend and was planning to take them to Waxahachie on the evening of October 4, 2002, for the weekend to visit family. After he got off work on the afternoon of October 4, he called Zula Mae, but she told him the girls were not there, so he decided to wait to pick them up until the next morning. At about 6:30 p.m., he saw Appellant at the Fastway store, and she told him the girls were "at home," by which he thought she meant they were back at Zula Mae's. Williams testified that Appellant got in a car with a man he did not know, and they drove off. If Appellant had asked him, he said, he would have taken the girls. He had his car and his house had beds, electricity, running water, and food. He also had a cell phone, and Appellant knew the number.

Sammy Beatty, a neighbor, testified that he has lived on Dallas Street all his life. He was living two houses down from the structure where Bowden was staying, and was renovating the home next door. In a statement to police after the fire, Beatty said that "the kids should never have been in that house," although at trial, Beatty testified "the house was fine to me as far as them being in that house. But, you know, some people may say maybe they shouldn't have been there because the house was—you know, didn't have everything like water and stuff."

On the night of the fire, Beatty recalled, he was awakened by the sound of glass breaking and noise like screaming or yelling. He jumped up and tiptoed down the alley where he saw a glow coming from the fire in the back. He saw Bowden standing outside, "hysterical," and screaming "my babies, my babies." Brenda Strawn, Beatty's girlfriend, also testified that, on the night of the fire, she heard screaming and glass breaking. By the time she got her clothes on and went outside, Beatty had already been outside for about ten minutes. Strawn saw Bowden, who was "like in shock or something." He just shook his head when she asked him what was happening. She then saw Beatty trying to put out the fire.

A police investigator, John Lindsay, testified that he was on duty and was close by when he heard the dispatch with the address of the fire at about 1:30 a.m. on the police radio. He arrived within 30 seconds, he said, before the fire trucks. The building was already completely engulfed in flames. He encountered Bowden in front of the house with a towel wrapped around one hand. He recalled that Bowden told him: "[M]y babies are inside, my babies are inside." Bowden was frantic, nervous, and scared about the fate of the children.

When the fire department arrived, Officer Lindsay began directing traffic and saw Appellant arrive after the fire was extinguished, although he did not know at that time that she was the mother of the children. She was in the crowd that had

**3.** Since the fire, Williams had learned that he was not the father of Ujeana, although he was listed as the father of both on their birth certificates and had treated both as his daughters since they were born.

collected and left the scene accompanied by two other people, one of whom placed a blanket around her shoulders. Later, he was asked to look for her and bring her back, and he found her at the Budget Inn about 2:30 a.m., crying, with the blanket still around her. She went with him back to the scene, and he later took her to the police station where she was questioned.

Police Sergeant Ginger Harrill interviewed both Bowden and Appellant at the police station within a few hours after the fire. The State offered videotapes of statements of Bowden and Appellant, which were admitted together with an audiotape of a second statement of Bowden taken two days later.[4]

Bowden's first statement was taken at about 4:00 a.m., on the morning of the fire. He told Sergeant Harrill that he had been staying at the abandoned house as he had just started working and wanted to save money until he could find an apartment. He had stayed there a couple of years before and cared for an old man who died. Appellant asked if the girls could stay with him at the house that night because she wanted to go out. Bowden agreed, he said, and put the girls to bed in the back bedroom about 7:30 or 8:00 p.m.

Bowden stated that he lit the candle because there were no utilities there and he did not want the girls to be in the dark. He checked on the girls twice, then went to the couch in the front room where he fell asleep. He did not know why he did not think to blow the candle out. When he woke up to check on the girls, the back room was on fire; flames were coming out of the door between the front rooms and the back room, and he could not get into the room where the girls were because of the flames. He was calling the girls and

they were screaming. He ran out the front door and broke out the bedroom window, cutting his hand and knocking over a dresser sitting in front of the window, but still could not get in because of the flames. He then went to the back and knocked down the door that had been nailed shut but could not get in that way. He ran through a hole in the fence and yelled to several people who had gathered to call the fire department. By that time, he could see flames in the front room and coming from the roof.

Appellant was interviewed at approximately 5:00 a.m., still wrapped in the blanket and showing signs of recent crying. As noted by Sergeant Harrill when Appellant could not think of her daughters' birthdays, Appellant was under a great deal of stress. In response to questions from Sergeant Harrill as to her activities of the evening, Appellant recalled that she had gone to the store twice, the first time to get cigarettes and, as she had no money left for food the girls had wanted, she went back the second time at about 10:00 p.m., to get them "Little Debbies" and chips.

Appellant said that, before she left the second time, she checked the house and went in the back room, and that was when she lit the candle, a "melted candle . . . inside an aluminum pie plate," because it was getting dark, and she set it on the middle of the bed. The girls were awake and in the front room on the couch at that time. By the time she left, they had gone in the back room, she said, and Bowden had gone back there with them. She knew they were lying on the bed because she "hollered" and asked them if they were on the bed and they said "yes, ma'am." She

---

4. The jury was instructed in the charge not to consider Bowden's statements as evidence against Appellant. We will thus confine our consideration of his statements to the extent that they provide contextual background and not as evidence against her.

said she did not know where Bowden later set the candle.

Appellant denied that she had any plans for the evening. She recalled that, after she left Bowden with the girls the second time, she first stopped off at about 8:25 p.m. at the house of a neighbor who had called to tell her that a man named Jerry wanted her to call him, and she spent some time sitting in the yard visiting with the neighbor, trying to contact Jerry. She never was able to talk to Jerry, and arrived at the store at about 10:00 p.m. She started walking after she bought the food the girls wanted, got a ride from a man in a van, went to the Budget Inn, and spent time visiting with women known as "Easy B" and "Dee," who stayed there. She did not believe it at first when a man told her that her children had been "burned up" in the fire, but then realized she needed to get back and got a ride back to the house, and that is when she saw the girls "laying there."

Appellant stated she had only taken the children down to the place where Bowden was staying to spend the night on two or three other occasions. But, she told Officer Harrill: "Like Mama said, we should've brought 'em home." As to why she didn't, Appellant answered, "because Mama wasn't there. Mama don't make it home until after 5:30." Appellant volunteered to Sergeant Harrill: "I know that room, I put the dresser ... I put the stuff there in that room. I sat the dresser in front of that window ... and a chair in front of that door and that door was locked...." At that point, Sergeant Harrill terminated the interview.

In his second statement two days after the fire, Bowden told Sergeant Harrill that, in addition to the boarded up back door and the dresser in front of the window, the room where the girls were had two interior doors, but one opened to the inside of the girls' room and had no doorknob; thus, the girls could not have opened it from their room and he would have had to push on it from outside the bedroom to open it. Bowden at first insisted again that he was the one who lit the candle. He stated that the girls were asleep when he lit it at about 9:30 p.m., before he went down to a neighbor's for a minute, in case they woke up so they "could see." But he then remembered that Appellant lit the candle while they were in the bedroom talking and sitting on the bed before she went out that night. She set it on the bed, he said, and he later set it on the floor and pushed it back away from the bed.

Battalion Chief Lynn Holzer of the Wichita Falls Fire Department testified that he arrived about four minutes after the dispatch call at 1:33 a.m. A fire squad was already there stretching hose over the fence. He did a walk-around and noted that there was no meter hookup or utilities and he assumed the house was vacant. A couple of minutes later he learned children were trapped inside. But by the time he arrived, he said, the fire was fully involved, and it was impossible to enter the house because it was "too far gone." A person trying to go into the house would not have lasted two or three seconds. He testified that he could not give a time frame for how long the house had been on fire when he arrived.

Chief Holzer testified that the Fire Department learned that children were inside from people in the street. They got inside as fast as they could after putting the fire out, and began pulling away material from the back of the roof that had collapsed. Fire was still burning under the roof. They had to enter the back room from outside as the front was blocked by debris. The first body was found when it fell out on the ground as some roof material was

pulled away. The second body was found ten or fifteen minutes later in the center of the room. From all the reports, he said, it was never suggested that the fire was intentionally set; it was uniformly determined to be "accidental."

Jim Graham, the Assistant Fire Marshal for the Wichita Falls Fire Department and a certified arson investigator, arrived at the scene at 1:55 a.m. He investigated the fire and testified as to his conclusions about the origin and cause of the fire. Graham testified that he spoke briefly with Bowden at the scene, and Bowden told him that there were no utilities so they were using candles and that his girlfriend's daughters were with him. According to Graham, Bowden described how he tried to get in the bedroom door and cut his hand breaking out the window.

Graham determined that the northwest room in which the girls had been sleeping was where the greatest amount of damage occurred. He identified the remains of a mattress on top of two sets of box springs in that room. He believed the point of origin of the fire was somewhere up off the floor in the northwest room behind the bed, and that the fire burned upward and outward toward the door Bowden stated he tried to enter. That door was within a few feet of where the candle had been and was "intimate" with the ignition. Charring on what remained of the door was consistent with the fire starting a few feet to the left of it. In his opinion, that door was closed during the fire. The fire would have moved to the center of the room and the ceiling collapsed as the fire grew. Within a short period of only five to seven minutes, the heat would have grown to the "flashover" point of eleven hundred to twelve hundred degrees in that room.

Nothing was found to indicate the fire was intentionally set, such as flammable liquids or patterns, and he excluded smoking, appliances, or heating. Graham concluded that the fire was "unquestionably accidental." In his opinion, the fire most likely started in the back bedroom by the accidental introduction of an open flame, when clothing or a sheet came into contact with the candle, perhaps when one of the girls rolled over on the bed.

Graham explained that children under the age of five have a much greater proportion of fire-related deaths than older persons, whereas thirteen- or fourteen-year olds have a much better chance of getting out of a fire. Seven- and eight-year olds are somewhere in the middle and may be able to get out but would "more than likely" need assistance or direction to get out of the room through the only available doorway. In Graham's opinion, the girls were close enough to the door that they should have been able to make it to the door but, instead, both of their bodies were found "remote" from the doorway.

Graham further testified that one girl had apparently crouched against the back wall; the other was found face-up in the center of the room, indicating that she may have been trying to climb the dresser toward the window and fell back when the dresser was knocked over. The autopsy report revealed that one of the girls had enough carbon monoxide in her to have affected her ability to escape or make any kind of decisions. There were a number of things going on in the room affecting their ability to make decisions: the lowered oxygen, carbon monoxide, and all the effects of a fire.

## ANALYSIS

### I. Legal Sufficiency of the evidence

 Appellant's first point complains that the evidence is legally insufficient to establish the elements of the offense beyond a reasonable doubt. In reviewing

the legal sufficiency of the evidence to support a conviction, we view the evidence in the light most favorable to the verdict in order to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *Ross v. State,* 133 S.W.3d 618, 620 (Tex.Crim.App.2004).[5] This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson,* 443 U.S. at 319, 99 S.Ct. at 2789.

The trier of fact is the sole judge of the weight and credibility of the evidence. *See* TEX.CODE CRIM. PROC. ANN. art. 38.04 (Vernon 1979); *Margraves v. State,* 34 S.W.3d 912, 919 (Tex.Crim.App. 2000). Thus, when performing a legal sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the fact finder. *Dewberry v. State,* 4 S.W.3d 735, 740 (Tex.Crim.App.1999), *cert. denied,* 529 U.S. 1131, 120 S.Ct. 2008, 146 L.Ed.2d 958 (2000). We must resolve any inconsistencies in the evidence in favor of the verdict. *Curry,* 30 S.W.3d at 406. The standard of review is the same for direct and circumstantial evidence cases. *Burden v. State,* 55 S.W.3d 608, 613 (Tex.Crim.App.2001); *Kutzner v. State,* 994 S.W.2d 180, 184 (Tex. Crim.App.1999).

Appellant argues that there is legally insufficient evidence of "reckless injury" because there is no evidence of a substantial or unjustifiable risk of serious bodily injury to the children, that she was aware of the risk, or that she consciously disregarded it. In that regard, Appellant contends that the State merely alleged reckless injury by having the children in a house without utilities as opposed to a home that had them. She reasons that, under the State's theory, presumably Appellant would have no culpability for the girls' deaths if they had perished in a fire from a lit candle in their grandmother's home or some other building with working utilities, and that having utilities does not prevent candle fires. She points out that both Chief Holzer and the arson investigator testified that the majority of accidental fires are caused directly or indirectly by either gas or electric utilities, and that the arson investigator agreed that the fact that a home did not have utilities did not make it an immediate threat. Thus, Appellant contends that simply having the children in a house without utilities should not be considered "reckless." We disagree, however, with Appellant's interpretation of the State's allegations and evidence.

The State did not merely allege that Appellant took the children from a house with utilities to a building without utilities but also that she left the children in a room in that building and left a lit candle in the room or left them to sleep in the room with a burning candle. The evidence of these facts was undisputed. Zula Mae was raising Appellant's daughters in her home with electricity, beds, and running water. Appellant was supposed to have stayed with the girls at Zula Mae's house until Zula Mae got home on the night of the fire. But Bowden and Appellant took the girls from that house about 5:15 p.m., before Zula Mae returned from work. Zula Mae had worked at Sike's Center Mall for twenty-five years, and Appellant

5. In a legal sufficiency review, we consider only evidence that supports the verdict. *Clewis v. State,* 922 S.W.2d 126, 142, n. 10 (Tex. Crim.App.1996). To the extent that we review all of the evidence, we are to do so only to determine whether it supports the verdict. *Id.* (citing *Chambers v. State,* 805 S.W.2d 459, 461 (Tex.Crim.App.1991)).

admitted that she knew Zula Mae would be home from work by 5:30. The jury could have reasonably concluded that Appellant and Bowden could have waited with the girls at Zula Mae's house until Zula Mae returned, and then left them with her for the evening. Or the jury could have inferred that Appellant and Bowden could have returned the girls to Zula Mae's house later when Appellant decided to go out for the evening or that Appellant could have even asked their father, Charles Williams, to take the girls to his home, which also had utilities, when she saw him at the store.

The evidence was further undisputed that Appellant chose, instead, to take the girls not simply to a house without utilities but to an abandoned structure that was her boyfriend's temporary living quarters that she knew had no lights, no kitchen, and no bathroom, that she chose to put them in the back room with a candle she lit, and that she chose to leave them there for several hours to sleep in a room which she knew had only one exit, the door that the jury was free to believe was shut during the duration of the fire. There was evidence of an obvious risk of danger from Zula Mae's testimony that she had warned both Appellant and Bowden not to be taking the girls there and burning candles, and from the statement of the neighbor, Sammy Beatty, that the girls should never have been in that house. Viewing the evidence and inferences most favorably to the verdict, the jury could have rationally found·that Appellant's conduct in leaving them to sleep in that room with the candle burning for more than five hours exposed the girls to a substantial risk of serious bodily injury.

Appellant next contends that there is no evidence that she was aware of the risk. Appellant argues that the only evidence of her awareness was the warning by Zula Mae, but that Zula Mae admitted she had never been to the house and, therefore, had no personal knowledge of the actual risk. Appellant also points out that the neighbor, Sammy Beatty, testified that the house was "fine" to him. But the jury was free to accept Zula Mae's testimony regarding her warning of the danger to Appellant as evidence of Appellant's own awareness of the risk, regardless of Zula Mae's knowledge, especially in light of Appellant's admission that Zula Mae was "right," that they should have taken the girls home. The jury was likewise free to disregard Beatty's testimony that the house was fine for the girls to be in and to accept his statement that the girls "should never have been in that house."

Additionally, the jury heard Zula Mae's testimony that Appellant had told her that she always made sure to put the candles out before going to sleep and could rationally conclude from that evidence that Appellant was aware of the risk of fire from the candles. The jury could further have believed that Appellant was aware of the danger from Zula Mae's testimony that she believed Appellant would have extinguished the candle if she had been at the house that night. Finally, the jury could have concluded that Appellant was aware of the risk from the testimony that she lied to the girls' father at the convenience store about where they were.

Moreover, by her own statement, Appellant was familiar with the room where she placed the children to sleep, knew that the dresser was in front of the only window because she had put it there, and must have also known there was only one possible escape route through an interior door with the back door boarded up and the other door lacking a knob.

Appellant argues that the presence of the candle posed a risk only to the extent that it remained lit while the children were

asleep in the room, but that they were still awake when she left, and she had no opportunity to extinguish the candle while she was gone. However, again, we note that it was Appellant's choice to be gone for several hours. And regardless of whether the children were still awake, the jury heard Appellant's statement that she made sure they were in the bed before she left with the candle still burning in the room and had no reason to think they would still be awake several hours later when she returned. We conclude that there is legally sufficient evidence that Appellant was aware of and consciously disregarded a substantial risk of serious bodily injury to the girls by leaving them to sleep with the candle burning in the room.

Appellant next contends that the State failed to establish that there was no justification for taking the risk. Appellant points out that Zula Mae was not home when Appellant and Bowden took the girls and argues that there is no evidence as to what time Zula Mae arrived home and no evidence that the children would have been safe there alone at Zula Mae's house or how safe the streets would be to travel on that night, so that whether the children would have been safer by staying or returning to Zula Mae's home is speculation.

Contrary to Appellant's argument, Zula Mae testified that she arrived home at 5:30 p.m. Appellant knew where her mother worked, and knew that she would arrive home at 5:30 p.m. And, according to Charles Williams, Zula Mae was at home when he called about taking the girls to Waxahachie. Zula Mae stated she waited throughout the evening for the girls to return. Thus, the jury could conclude that the children need not have been left at Zula Mae's alone because she arrived within fifteen minutes after Appellant and Bowden left. And if they had waited the fifteen minutes, there would have been no

need to walk the few blocks to return the children to her house later. Moreover, the jury could reasonably have concluded from Appellant's own description of her activities during that evening that Appellant and Bowden had no compelling reason even to take the girls down to Bowden's place that night. Viewing the foregoing evidence and inferences in the light most favorable to the verdict, we conclude that there was legally sufficient evidence that the risk to which Appellant's conduct exposed the girls was unjustified.

We also conclude that the evidence is legally sufficient to show that Appellant's conduct, not in merely leaving the girls in a room without utilities but in leaving them in that structure and in that room to sleep with a candle burning for light and only one escape route, rather than leaving them at their own home or returning them to their own home which had utilities, constituted a "gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from [appellant's] standpoint." TEX. PENAL CODE ANN. § 6.03(c).

Appellant makes several additional arguments that we will interpret liberally as attempting to challenge causation by arguing that it was Bowden's conduct, rather than hers, that caused the fire and the deaths of the girls. Appellant argues that she left the children in Bowden's care, that there was considerable evidence that he cared for the children as his own, and that there was no evidence suggesting she should have suspected he could not be trusted to carefully watch the girls. Appellant contends that she had no way of knowing that, after she left, he would move the candle down onto the floor and push it behind the bed, or that he would leave it burning. She argues that it must have been Bowden's placement of the candle that caused the fire. Finally, she contends

that she had no opportunity to extinguish the candle because she was not there when the girls fell asleep.

 Under Section 6.04(a) of the penal code, as previously stated, a person is criminally responsible if the result would not have occurred but for his conduct, operating either alone or in conjunction with another cause, unless the concurrent cause was clearly sufficient to produce the result and the conduct of the actor clearly insufficient. TEX. PENAL CODE ANN. § 6.04(a). Two combinations may exist to satisfy the requisite causal connection and the harm when there are concurrent causes: (1) the appellant's conduct may be sufficient, by itself, to have caused the harm, regardless of the existence of a concurrent cause; or (2) the appellant's conduct and the other cause together may be sufficient to cause the harm. *Robbins v. State,* 717 S.W.2d 348, 351 (Tex.Crim.App. 1986); *Umoja v. State,* 965 S.W.2d 3, 9 (Tex.App.-Fort Worth 1997, no pet.). Under either scenario, criminal responsibility is limited by the qualification of Section 6.04(a), "unless the concurrent cause was clearly sufficient to produce the result and the conduct of the actor clearly insufficient." Thus, evidence of causation will be legally insufficient only when the conduct of the appellant, standing alone, is "clearly insufficient." *Marvis v. State,* 36 S.W.3d 878, 881 (Tex.Crim.App.2001) (Price, J., concurring). Here, the evidence shows that a concurrent cause, Bowden's conduct in leaving the children alone in the room asleep with the candle burning after placing it on the floor but still near enough to set fire to the bedclothes, was clearly sufficient to have caused serious bodily injury to the girls based on the fire investigator's conclusion that fire in which they died was, indeed, caused in that manner. The evidence that Appellant and Bowden together took the children to the structure where

Bowden was staying without utilities, together agreed that he would stay with the girls, and together left the candle burning in the same room with the girls in bed for the night, with both knowing that all possible exits but one were blocked and both knowing that burning candles with the children there was dangerous, was sufficient to establish that Bowden's and Appellant's conduct together was sufficient to have caused the harm. This leaves the question: Was Appellant's conduct, standing alone, "clearly insufficient?"

As the girls' mother, Appellant was at least as responsible as Bowden for the decision to take them from Zula Mae's house to the structure, and she, herself, "knew that room," had placed the dresser in front of the window and the chair in front of the locked door. Appellant lit the candle and made sure the girls were in bed in the room with the candle burning before she left for several hours. From the evidence that she always made sure to extinguish the candle, the jury could have inferred that Appellant assumed the role of making sure of extinguishing the candles in that house. This is supported by her statement to Sergeant Harrill that she had no idea what Bowden may have done with the candle after she left. The jury could have inferred that Appellant was aware of but disregarded the risk that Bowden would not know what to do with the candle, specifically that he should extinguish it before leaving the room with the girls asleep. Moreover, Appellant acknowledged that she did not expect the girls to be awake when she returned hours later. Thus, the jury could have further inferred that she was aware of but disregarded the fact that they would fall asleep with the candle burning.

We conclude that the record, viewed in the light most favorable to the verdict, supports the inference that if Appellant

had not taken the children to that house and put them to bed with the candle burning that she, herself, had lit, or if she had at least been there to extinguish the candle before the girls went to sleep as the evidence indicated she probably would have done, the girls would not have died in the fire. Thus, we cannot conclude that Appellant's conduct was "clearly insufficient," standing alone, to cause serious bodily injury and death to the girls. We hold that there was legally sufficient evidence that Appellant recklessly caused serious bodily injury to the children as charged and found by the jury.

### 2. Factual Sufficiency

■■■■ Appellant's second point challenges the factual sufficiency of the evidence to support the elements of the offense of reckless injury to the children. In reviewing the factual sufficiency of the evidence to support a conviction, we are to view all the evidence in a neutral light, favoring neither party. *Zuniga v. State,* 144 S.W.3d 477, 482 (Tex.Crim.App.2004). The only question to be answered in a factual sufficiency review is whether, considering the evidence in a neutral light, the fact finder was rationally justified in finding guilt beyond a reasonable doubt. *Id.* at 484.

■■■■ There are two ways evidence may be factually insufficient: (1) the evidence supporting the verdict or judgment, considered by itself, is too weak to support the finding of guilt beyond a reasonable doubt; or (2) when there is evidence both supporting and contradicting the verdict or judgment, weighing all of the evidence, the contrary evidence is so strong that guilt cannot be proven beyond a reasonable doubt. *Id.* at 484–85. "This standard acknowledges that evidence of guilt can 'preponderate' in favor of conviction but still be insufficient to prove the elements of the

crime beyond a reasonable doubt." *Id.* at 485.

■■■■ In other words, evidence supporting a guilty finding can outweigh the contrary proof but still be insufficient to prove the elements of an offense beyond a reasonable doubt. *Id.* In performing a factual sufficiency review, we are to give deference to the fact finder's determinations. *Id.* at 481; *Cain v. State,* 958 S.W.2d 404, 407 (Tex.Crim.App.1997). We may not substitute our judgment for that of the fact finder. *Zuniga,* 144 S.W.3d at 482.

■■■■ Resolving conflicts in the evidence is the jury's role. In doing so, it may accept one version of facts and reject another, or reject any part of a witness's testimony. *Penagraph v. State,* 623 S.W.2d 341, 343 (Tex.Crim.App.1981). It is the jury's prerogative to judge the credibility of the witnesses as well as the weight to be given their testimony. *Banks v. State,* 510 S.W.2d 592, 595 (Tex.Crim.App. 1974). Thus, we can consider only those few matters bearing on credibility that can be fully determined from a cold appellate record. *Johnson v. State,* 23 S.W.3d 1, 8 (Tex.Crim.App.2000). Conflicts between witnesses will generally be inviolate, although the validity of testimony can be treated as questionable because of other factors such as adverse conditions affecting the ability of the witness to observe certain facts. *Id.* Our role is not to "find" facts; rather, it is to see if we can determine that the verdict is against the great weight of the evidence presented at trial so as to be clearly wrong and unjust. *See Clewis,* 922 S.W.2d at 135.

Viewing all of the evidence in a neutral light, in addition to the evidence detailed above, it was undisputed that Appellant did not leave the girls in the room alone to sleep with the candle burning, but that Bowden had agreed to and did stay with

the girls. Bowden was in the room with Appellant when she lit the candle before she left the second time, and Bowden was in the back room with the girls when Appellant left. There was evidence that Appellant could have trusted Bowden to take care in keeping the girls that night. Bowden and Appellant had been seeing each other for about four years. Charles Williams and Sammy Beatty both testified that Bowden seemed to be a friend to the girls and Beatty recalled that he sometimes heard them call him "Dad." Beatty had known Bowden for many years, since they were kids. Beatty owned two houses on Dallas Street, including the one next door to the structure Bowden was staying at. Beatty was remodeling it and Bowden was helping him. Bowden also had started working at Bennigan's with Beatty, so they worked together almost every day. Beatty recalled that Bowden would get food for the girls at Bennigan's almost every day.

In Bowden's first statement, he said he checked on the girls twice during the evening. The girls were sleeping on a full size mattress on top of two king size box springs. They had a bottom sheet and three covers. He went in to check on them to see whether they were cool or comfortable and they had changed positions. He had given the girls sweatshirts to wear earlier because they were cold. Ujeana had his sweatshirt on and Precious had made a pillow out of the one he had given her to wear. In his second statement, Bowden elaborated that the girls were just like his own children to him. He spent his money on them, and his time with them. Zula Mae had complained to him about how much he baby-sat the girls when Appellant would go places. The

girls were always a number one priority for him.[6] There was no evidence that Bowden used drugs or alcohol that night. The jury could reasonably have concluded that Appellant did not act recklessly in leaving the girls in Bowden's care with the candle still burning.

As to whether the girls should have been in the house, Sammy Beatty testified that he could not answer "yes or no." He knew what it was like to be poor and "do without," it can happen to anyone. He had been thinking of buying that structure a couple of years before. It was just right to add it to his house. To him, the house was "fine," meaning that it was fine enough that he wanted to add it to his house; it was well-insulated, had better windows than his own, was a solid structure, and he would not mind staying in it, himself. The evidence also showed that, once the fire started, it spread rapidly and reached the flashpoint of over twelve hundred degrees within a very short time of five to seven minutes. When Bowden tried to enter the room through the available door, he was blocked by the flames and smoke. And the arson investigator agreed it would not have made any difference which room Bowden ran out of or which direction he ran out to try to knock out the window or knock down the back door. Thus, there was evidence that the girls could not be saved because of the intensity of the heat and flames, rather than the blocked exits. Indeed, there was no evidence that Bowden or anyone else would have been able to rescue the girls once the fire started.

The arson investigator further testified that most people in burning buildings man-

6. He was angry that people said he was not in the house when the fire started and that Beatty's girlfriend said he did not know if the girls were in the house at the time of the fire. He said: "How could I not know?" It was very hard, he said, for him to admit that he was in the house; he was there. The arson investigator admitted he had no facts that Bowden was not in the house when the fire started.

age to get out. The available door was within six feet of the bed and there was "really no reason" the girls should not have been able to get to the door and get out, unless the door were locked or obstructed or they were overcome by heat, carbon monoxide, or lack of oxygen. They were old enough to at least try to get to the door and get out.

As to the lack of utilities, Battalion Chief Holzer testified that the majority of home fires the department responds to are in homes *with* utilities and that a major concern for them is to make sure the utilities are turned off. And the fire investigator agreed that electrical distribution equipment such as wiring, outlets, and cords are the second leading cause of fire death and the third leading cause of fires in the United States. Cooking fires are "number one." Only 15 percent of fires in 2001 were attributable to open flames or embers. Fires can occur in homes that have utilities; lack of utilities does not create an immediate chance that there will be a fire. Sammy Beatty did not believe candles were inherently dangerous and believed his girlfriend had some. Zula Mae admitted she had scented candles in her house that she used sometimes even when children were around.

Zula Mae acknowledged that, although the girls had described the house to her, she did not personally go down to look at it. And the jury could have accepted Zula Mae's testimony that Appellant said she always made sure to put out the candles before going to sleep and probably would have done so had she been there as evidence that Appellant exercised care with candles in the house.

There was no evidence that either the condition of the structure, the boarded up door, or the lack of a door knob on a second door was the sole cause, although there was some evidence that these conditions were contributing causes, of the girls' bodily injuries and deaths. It was undisputed that Appellant did not leave the girls alone to sleep in the room with the candle burning but left them awake with Bowden in the room to care for them, and there was evidence that he was trustworthy to care for the children.

Nevertheless, the evidence remains that Appellant, along with Bowden, took the children to Bowden's place and left them to sleep in a room with the candle burning in disregard of her mother's warnings and her own admitted awareness of the danger of fire. The evidence remains that Appellant had no plans for the evening, yet she and Bowden inexplicably could not wait fifteen minutes for Zula Mae to return from work to keep the girls. The evidence remains that Appellant then left the girls for several hours while she looked for "Jerry," visited a neighbor down the street, got a ride from a man outside the store, got a ride from another man while walking to the Budget Inn, and spent the rest of the evening at the Budget Inn. Most significantly, the evidence remains that she was not there to extinguish the candle when the children went to sleep. Had she been there, Zula Mae said, Appellant probably would have extinguished the candle, but for which the girls' tragic deaths would not have occurred.

Viewing the evidence in a neutral light, there is evidence both supporting and contrary to the verdict. The jury could rationally have accepted Appellant's theory that the fire was simply a tragic accident unconnected to her conduct in leaving the children with Bowden to sleep in the back room with the lit candle. Or the jury could have rationally accepted the State's theory that the conduct of both Appellant and Bowden concurred in recklessly causing serious bodily injury to the girls. Under this state of the record, we cannot

conclude that the evidence supporting the jury's verdict is so weak or the contrary evidence so strong that the beyond-a-reasonable-doubt standard could not have been met so that the guilty verdict cannot stand. *See Zuniga*, 144 S.W.3d at 477, 481; *see also Goodman v. State*, 66 S.W.3d 283, 287 (Tex.Crim.App.2001) (describing evidence in "fair equipoise" as precluding reversal for factual insufficiency).

This is a troubling and tragic case. Poverty and having to "do without" is not a crime, but Appellant had choices she chose to disregard. And we do not hold that evidence of leaving children with another adult in a room with a candle burning, with or without utilities, standing alone, constitutes conscious disregard of a substantial risk of serious injury. Nor do we hold that failing to do what "Mama says" necessarily constitutes reckless or even negligent conduct. But we do not sit as a thirteenth juror. While we may not have reached the same decision on the facts as the jury, when we consider all of the evidence in a neutral light, we are compelled to conclude that the proof supporting the verdict is not so weak nor the evidence contrary to the verdict so strong that the jury was not rationally justified in finding guilt beyond a reasonable doubt. We overrule Appellant's factual insufficiency point.

## CONCLUSION

Having overruled both of Appellant's points challenging the legal and factual sufficiency of evidence to support the two counts of the offense of reckless injury to a child causing serious bodily injury, we affirm the conviction and judgment of the trial court.