IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NO. PD-0446-06






SHARAN ANN WILLIAMS, Appellant



v.



THE STATE OF TEXAS





ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW


FROM THE SECOND COURT OF APPEALS


WICHITA COUNTY






 Cochran, J., delivered the opinion of the Court in which, Price,
Womack, Johnson, Keasler, Hervey and Holcomb, JJ., joined. Keller, P.J., 
filed a dissenting opinion in which Meyers, J., joined.


O P I N I O N 


 

 We granted appellant's petition for discretionary review to examine the culpable mental
state of recklessness.

 Appellant was convicted of injury to a child and sentenced to fifteen years'
imprisonment after her two children died in an accidental house fire while her boyfriend was
babysitting them. We hold that the evidence in this case was legally insufficient to support her
conviction under Section 22.04 of the Texas Penal Code. (1) The court of appeals erred in
concluding that the State proved the criminal offense of reckless injury to a child when the
evidence showed that appellant took her children from their grandmother's house (which had
working utilities) to her boyfriend's temporary home (which did not have working utilities) and
left them under her boyfriend's care with a lit candle in the bedroom. (2) The State's proof of
these facts-proof beyond a reasonable doubt-did not establish a criminally culpable reckless
state of mind. Further, the State did not prove that appellant's acts or omissions caused the
death of her children. (3)

I.

 Two of appellant's children, Ujeana, age seven, and Precious, age eight, died in a house
fire in the early morning hours of October 5, 2002. Ujeana, Precious, and appellant lived with
appellant's mother, Zula Mae Scott, who routinely cared for the young girls. Occasionally the
girls stayed with their father, Charles Leon Williams, Jr. Sometimes they stayed with appellant
and her boyfriend, Herbert Ronald Bowden, in his "home." Bowden lived in an altered duplex
with both halves of the house combined into a single unit. It was a four-room structure, but it
had no kitchen or bathroom, no working utilities, and very little furniture. In Bowden's
bedroom there was a bed, as well as a dresser under the window, and a chair in front of the
nailed-up door to the outside. There was a couch in the living room. The house was, according
to Bowden, "somewhat trashy." There was indeed trash on the floor, mainly in the living room. 


 Bowden lived in this makeshift home with permission, and he paid a nominal rent. He
intended to live there until he saved enough money from his new job at Bennigan's restaurant
to afford a proper apartment. About two weeks before the fire, Zula Mae learned that appellant
and Bowden were taking the children to the duplex. She warned them both that "it was too
dangerous to be taking them down there and burning candles," in part because of the risk of a
house fire.

 Nevertheless, after he got off work on October 4, 2002, Bowden went to Zula Mae's
house to pick up appellant and her girls. Zula Mae was not yet home from work. The four
walked to his duplex. Appellant went out to get cigarettes and ran into the girls' father, Charles
Leon Williams, Jr., in the parking lot of the store. He asked appellant where the girls were. 
She told him that they were "at home," which meant, to Mr. Williams, "with Zula Mae." Mr.
Williams saw appellant leave the store in a car with a man who was not Bowden.

 When appellant returned to the duplex, she told Bowden that she wanted to go out with
friends, and he agreed to watch the girls. He dressed them in his sweatshirts to keep them
warm, and then he and appellant put the girls to bed in his bedroom. They placed a burning
candle in an aluminum pie plate for light (4) because Bowden did not want the girls to be left "in
the dark." Bowden said that he and appellant "were sitting there talking and um, and uh, soon
as we got through talking I took the candle and sat it over there in the corner at the edge of the
bed. I sat it there." The candle was closer to the wall than the bed. After appellant left,
Bowden checked on the girls who were asleep with the candle still lit. "I don't know why I
didn't think to blow the candle out, I just didn't want them to be in the dark."

 Bowden said that he left the house only once-around 9:30-to get a cigarette from his
neighbor Preston. Then he "ran on back down the street and went on back in the house and went
and checked on 'em and they were still sleep. And I went and sat in the living room on the
couch. And then I went and got up and checked on 'em again and that was I'm saying that was
about 10 o'clock or so." 

 Bowden finally fell asleep on the living-room couch. His neighbor Preston woke him
up about 11:00 p.m. He was outside "hollering" and "asking about Sharan 'cause apparently
he had loaned her a couple of dollars or something and he needed it. So uh, I was telling him
she wasn't there." Bowden came back inside because it was "cool" outside, and "I didn't have
on any shoes or nothing and I went out there just in my socks." He checked on the girls again
and then once more fell asleep on the couch. 

 Around 1:00 a.m., Bowden woke up to loud screams and saw that the bedroom where
the girls were sleeping was on fire. When he looked in the "open" door all he could see "was
flames and smoke." (5) He said he got down close to the floor, but he "could barely even see the
bottom of the bed you know? And it was that much smoke in there." He could still hear the
girls screaming, and he was "hollering, calling their names, but they wasn't responding like they
heard my voice." He ran out of the front door, and "I went around to the side window and uh,
knocked it out. But flames were coming out of it." When he could not get in the window, he
ran around to the boarded-up exterior bedroom door and tried to pull it open, but again he could
not get inside. 

 Wichita Falls Police Officer Jonathan Lindsay was the first emergency responder. 
When he arrived, he saw Bowden with a towel wrapped around one of his hands, crying "my
babies are inside, my babies are inside." Bowden was "frantic." By the time the fire department
arrived, the house was "fully involved" with flames, and the firemen were unable to enter it. The
children never got out. 

 Appellant, who had been told about the fire, arrived back at the scene as the fire
department was extinguishing the blaze. Bowden-who had cut his hand when he broke the
window trying to get to the children-was briefly checked out by medical personnel. He had no
burns or cough. 

 Jim Graham, the Assistant Fire Marshal for the Wichita Falls Fire Department, talked
to Bowden at the scene. Bowden told him about the candle, about waking up to find the
bedroom on fire, and about how he tried to enter the room first through the open bedroom
door, then through the outside window, and finally through the boarded-up back door. 

 A couple of hours later, Officer Ginger Harrill took statements from both Bowden (who
was still in his socks) and appellant. They were both cooperative. Officer Harrill took a
second statement from Bowden a couple of days later. Regarding these two statements,
Officer Harrill said, 

 Basically he was - both statements were consistent, that he was asleep on this couch,
and this door goes into this front bedroom, and the girls were sleeping in this rear
bedroom, and he woke up on this couch and heard them screaming and goes to this door,
which was open, and at that point he could see the doorway into this room and see the
room glowing.


When questioned about whether he was at Preston's house when the fire started, Bowden said,
"No, no, absolutely not." He stressed that he has always looked out for the kids-and that he
was there, asleep, when the fire broke out. "Their safety has always been a factor with me . .
. . I been around them for as long as I been around their mother. And you know, I'm not their
. . . father but it was just like they were my children you know?" Repeatedly pressed about
whether he left the children alone, he stated

 There's no way I would just leave, leave them in the house like that. Not them or
anybody else's kids. I wouldn't even have to know 'em. I just wouldn't do it. Kids
can't, they can't take care of they self. 


He reiterated that he was not at Preston's when the fire started, and that he was willing to take
a polygraph. He concluded,

 I, you know I haven't lied to you about anything concerning that. I mean it's hard enough
to admit that these kids died in my care you know? I couldn't, I couldn't have left them
like that. If anything I would've took 'em with me. I would've woke 'em up and took
'em with me.


 Appellant's statement related her activities that night. For the most part, her statement
did not make much sense. It was fractured and incoherent. She stated that as soon as she,
Bowden, and the girls arrived at the duplex, she went out to buy cigarettes. When she returned,
she "hung out" for a while with the girls and Bowden. Then she lit a candle in the bedroom and
put the girls to bed. Around 8:30 p.m., she went out to buy chips and Little Debbies for the
girls-something she was supposed to have done on her first trip to the store. She mentioned
a cast of characters that she saw or talked to during the evening: Paul Taylor, who gave her
change for the girls' snacks; Judy, the owner of Lucky One Stop; a "young Spanish guy" who
gave her a ride in a blue van; Christine, who lives down the street; Preston, from whose house
she called Jerry, Christine's cousin; Easy B (AKA Anita Gibson) and Dee, who live at the
Budget Motel; Shewe, who "got into it" with Easy B at the Budget Motel; an unknown man in
a van, "I don't know his name, he just gave me a ride"; BL (AKA Lewis) and Pine, who told her
the "girls just got burned up." Investigator Harrill asked appellant about Ujeana and Precious
staying at Bowden's place:

Harrill: Ok. Uh, how often do you and the girls stay down there?

Williams: Uh, Uh, We go down there sometimes . . . We don't stay down there, we slept
down there a couple of times.

Harrill: Um hmm.

Williams: 2 or 3 times. But we don't . . . Um, Like Mama said, we should've brought 'em
home.

Harrill: Well I'm not trying to be harsh but that's gonna come up. Why didn't you just
leave 'em at your mom's?

Williams Well at the time Mama wasn't there.

Harrill: Ok.

Williams: Mama wasn't there. 'Cause Mama don't make it home until after 5:30.

 Both appellant and Bowden denied drinking or getting high that night.

 Assistant Fire Marshal Graham investigated the fire and concluded that it was an
accident:

 There was absolutely nothing in this room that would lead me, as an investigator, to
believe that this fire was in any way intentionally set. We're looking at the accidental
introduction by a human of some-some open flame. Take that with Mr. Bowden's
statement of having a candle placed in there, that's exactly what we would have seen. 
Some material got too close to the candle. As the girls were described sleeping on the
bed, changing places, moving over, it's quite likely-the most likely scenario was a
sheet, maybe clothing, material used for-wrapped under their head for a pillow gets
knocked-either knocked off the bed or hangs off the bed. A[t] this point the candle can
ignite it.

 ---

 The cause of the fire was, without question, the introduction of an open flame to the
combustible material in the corner of that room. The only known open flame or alleged
open flame to be there was the candle that was put there for light that night.

Marshal Graham said that he also investigated why the girls could not get out of the bedroom.
From the burn patterns, he determined that one of the two front doors "was opened during this
fire." The burn patterns suggested both bedroom doors were closed for most of the fire. The
one Bowden said that he had opened could have been opened only "momentarily." But Marshal
Graham surmised that this door had probably never been opened because Bowden had no
symptoms of burns or smoke inhalation. The fire burned at 1,100 or 1,200 degrees, and,
according to the marshal, if Bowden had opened that door during "full room involvement," as
he said he did, he would have suffered "ill-effects. So it's just-it is more likely he never
opened that doorway." Other parts of Bowden's statement-breaking the window and trying to
open the boarded-up door-were corroborated by the physical evidence. Although Marshal
Graham could not specifically say that Bowden had been on the couch when the fire started,
he did acknowledge that Bowden's shoes were found next to the couch; and that he was outside
the burning house in only his socks.

 Bowden and appellant were each indicted for two counts of reckless injury to a child.
Bowden was alleged to have committed the two offenses "by leaving [each girl] in a room
without adult supervision with a candle burning." (6) Appellant was alleged to have committed the
offenses by either (1) taking the girls from a house with working utilities to a building without
them and leaving the children in a room with a lit candle, or (2) leaving them asleep in a
building without utilities with a burning candle instead of taking them to a house with working
utilities. These were the specific acts that the State relied upon to prove recklessness.

 The two cases were consolidated for trial, and both Bowden and appellant were
convicted. Bowden was sentenced to ten years' imprisonment on each count, and appellant was
sentenced to fifteen years' imprisonment on each count. 

 On appeal, appellant claimed that the evidence was legally and factually insufficient to
prove her guilt. The court of appeals rejected this claim and held, in essence, that a rational
trier of fact could conclude that the act of taking children from a home with utilities to one
without utilities and leaving them in a bedroom with a lit candle is sufficient to create the
known risk of death or serious bodily injury to those children, even if another adult caretaker
is present. (7) 

II.

 In assessing the legal sufficiency of the evidence under Jackson v. Virginia, (8) "we
consider all of the evidence in the light most favorable to the verdict and determine whether,
based on that evidence and reasonable inferences therefrom, a rational juror could have found
the essential elements of the crime beyond a reasonable doubt." (9) Under a legal sufficiency
review, "our role is not to become a thirteenth juror. This Court may not re-evaluate the weight
and credibility of the record evidence and thereby substitute our judgment for that of the fact-finder." (10) Thus, reviewing courts give deference to "'the responsibility of the trier of fact to
fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences
from basic facts to ultimate facts.'" (11) 

 A reviewing court's duty, however, does require it to ensure that the evidence presented
actually supports a conclusion that the defendant committed the crime that was charged. If the
evidence establishes precisely what the State has alleged, but the acts that the State has alleged
do not constitute a criminal offense under the totality of the circumstances, then that
evidence, as a matter of law, cannot support a conviction.

 To sustain a conviction for reckless injury to a child the evidence must prove that a
defendant recklessly, by act or omission, caused serious bodily injury to a child. (12) Injury to
a child is a result-oriented offense requiring a mental state that relates not to the specific
conduct but to the result of that conduct. (13) The State must prove that a defendant caused a
child's serious bodily injury with the requisite criminal intent. (14) Under the Penal Code,

A person acts recklessly, or is reckless, with respect to . . . the result of his conduct
when he is aware of but consciously disregards a substantial and unjustifiable risk that
the . . . result will occur. The risk must be of such a nature and degree that its disregard
constitutes a gross deviation from the standard of care that an ordinary person would
exercise under all the circumstances as viewed from the actor's standpoint. (15) 


 Criminal recklessness must not be confused with (or blended into) criminal negligence,
a lesser culpable mental state. With criminal negligence, the defendant ought to have been
aware of a substantial and unjustifiable risk that his conduct could result in the type of harm
that did occur, and that this risk was of such a nature that the failure to perceive it was a gross
deviation from the reasonable standard of care exercised by ordinary people. (16) Criminal
negligence depends upon a morally blameworthy failure to appreciate a substantial and
unjustifiable risk while recklessness depends upon a more serious moral blameworthiness-the
actual disregard of a known substantial and unjustifiable risk. 

 At common law, "the word 'reckless' or 'recklessly' was commonly used in expressing
the concept of criminal negligence." (17) However, Professor Perkins notes that, in most modern
penal codes, the two concepts have been distinguished and separated: 

 "recklessness" and "criminal negligence" represent different mens rea concepts
. . . . [but they] have one component in common. Each requires conduct which
represents a gross failure to measure up to the reasonable-person standard of
care. Assuming such conduct, if the actor was aware of the risk he was creating,
and consciously disregarded that risk, however much he may have hoped that no
harm would result, he was acting recklessly. (18) 


 Thus, "[a]t the heart of reckless conduct is conscious disregard of the risk created by
the actor's conduct[.]" (19) As has often been noted, "[m]ere lack of foresight, stupidity,
irresponsibility, thoughtlessness, ordinary carelessness, however serious the consequences
may happen to be," do not suffice to constitute either culpable negligence or criminal
recklessness. (20) Recklessness requires the defendant to actually foresee the risk involved and
to consciously decide to ignore it. (21) Such a "devil may care" or "not giving a damn" attitude
toward the risk distinguishes the culpable mental state of criminal recklessness from that of
criminal negligence, which assesses blame for the failure to foresee the risk that an objectively
reasonable person would have foreseen. (22) "Those who are subjectively aware of a significant
danger to life and choose, without justification, to engage in actions (or in some cases
inactions) that threaten to bring about that danger have made a calculated decision to gamble
with other people's lives." (23) This combination of an awareness of the magnitude of the risk (24)
and the conscious disregard for consequences is crucial. "It is callous disregard of risk, and
not awareness vel non of risk, however, which is critical." (25) And, of course, determining
whether an act or omission involves a substantial and unjustifiable risk "requires an
examination of the events and circumstances from the viewpoint of the defendant at the time
the events occurred, without viewing the matter in hindsight." (26)

 Whether a defendant's conduct involves "an extreme degree of risk" must be determined
by the conduct itself and not by the resultant harm. Nor can criminal liability be predicated on
every careless act merely because its carelessness results in death or injury to another. (27)

 In addressing the sufficiency of evidence to prove criminal recklessness, it is not
enough to provide the jury with a set of legally correct definitions and then simply turn them
loose and accept whatever they decide. Instead, there are "intermediate and progressively more
demanding burdens of production that must be met by the State, as a matter of law, before the
fact-finding process is even ratcheted up from one to the next higher level of possible
culpability[.]" (28) The State cannot be permitted to submit its case to the jury unless it has
offered a prima facie case of a defendant's actual, subjective "disregard of the risk of a
resulting [injury] which. . . rise[s] to the level of a 'gross deviation' from an ordinary standard
of conduct." (29) The incremental risk and mens rea that may transform mere civil negligence
into criminal negligence and then possibly into criminal recklessness are, although elusive,
substantive elements with unique burdens of production that must be satisfied as a matter of
law. 
 Numerous Texas cases have addressed factual scenarios in which the jury could
conclude that the defendant consciously disregarded a substantial and unjustified risk of
serious injury to a child. These include holding a child's feet under extremely hot water, (30)
ramming a parked car that had an 18-month-old child in it, (31) twisting and pulling a baby's leg, (32)
letting a 350-pound lion, which was neither muzzled nor declawed, out of its cage at a flea
market populated by children, (33) and speeding and running through stop signs with a child
passenger. (34) These cases involved an actor committing a highly dangerous act whose
substantial and unjustifiable risks were known to, (35) but disregarded by, the actor, and that act
led directly to serious harm to a child. In other reckless injury cases, the defendant failed to
perform an act that directly resulted in the injury. In one case the defendant was held to have
recklessly caused bodily injury to her children by failing to report to the authorities that her
boyfriend had violently kidnaped them. (36) In still other cases the actors have left a disabled
victim lying in bleach for at least an hour; (37) neglected a child; (38) failed to immediately seek
medical help for a lethargic child; (39)and left four-year-old twins unsupervised and wondering
around an apartment complex. (40) 

 Each of these cases involved "conscious risk creation." As noted in the Model Penal
Code commentaries, this "resembles acting knowingly in that a state of awareness is involved,
but the awareness is of risk, that is of a probability less than substantial certainty[.]" (41) A person
responsible for such "conscious risk creation" that results in serious bodily injury to a child
is "criminally responsible if the result would not have occurred but for his conduct, operating
either alone or concurrently with another cause, unless the concurrent cause was clearly
sufficient to produce the result and the conduct of the actor clearly insufficient." (42) The
defendant's conduct must be a direct cause of the harm suffered although, as set out in section
6.04(a), it need not be the only cause; it may be a concurrent cause. (43) 

 In sum, in addressing the culpable mental state of recklessness under section 6.03(c),
the factfinder (and a reviewing court) must examine the defendant's conduct to determine
whether

 (1) the alleged act or omission, viewed objectively at the time of its commission,
created a "substantial and unjustifiable" risk of the type of harm that occurred;


 (2) that risk was of such a magnitude that disregard of it constituted a gross
deviation from the standard of care that a reasonable person would have
exercised in the same situation (i.e., it involved an "extreme degree of risk,
considering the probability and magnitude of the potential harm to others"), (44) 


 (3) the defendant was consciously aware of that "substantial and unjustifiable" risk
at the time of the conduct; and


 (4) the defendant consciously disregarded that risk.


 With that background of the pertinent law concerning a reckless state of mind, the level
of risk required, and causation for the harm suffered, we turn to the present case.

III.

 The court of appeals held the evidence legally sufficient to prove that appellant
recklessly, by act or omission, caused serious bodily injury to her two children. (45) The court
further held that she was criminally responsible because (1) the result would not have occurred
but for her conduct, operating either alone or concurrently with Bowden's, and (2) while
Bowden's concurrent cause was clearly sufficient to produce the result, appellant's conduct
was not clearly insufficient. (46) The court of appeals found, in essence, that a rational trier of
fact could conclude that

 (1) taking children from a home with utilities to one without utilities, and 

 (2) leaving them in a bedroom with a lit candle, 

 (3) creates the foreseeable risk of death or serious bodily injury to those children, 

 (4) even if another adult caretaker is present. (47) 

Furthermore, the court concluded that there was legally sufficient evidence to support a finding
that appellant was consciously aware of this risk and that she disregarded it. The court of
appeals stated,

 As the girls' mother, Appellant was at least as responsible as Bowden for the
decision to take them from Zula Mae's house to the structure, and she, herself,
"knew that room," had placed the dresser in front of the window and the chair in
front of the locked door. Appellant lit the candle and made sure the girls were
in bed in the room with the candle burning before she left for several hours. 
From the evidence that she always made sure to extinguish the candle, the jury
could have inferred that Appellant assumed the role of making sure of
extinguishing the candles in that house. This is supported by her statement to
Sergeant Harrill that she had no idea what Bowden may have done with the
candle after she left. The jury could have inferred that Appellant was aware of
but disregarded the risk that Bowden would not know what to do with the candle,
specifically that he should extinguish it before leaving the room with the girls
asleep. Moreover, Appellant acknowledged that she did not expect the girls to
be awake when she returned hours later. Thus, the jury could have further
inferred that she was aware of but disregarded the fact that they would fall asleep
with the candle burning. (48)


 Appellant asserts that the court of appeals, in so holding, engaged in "precisely the sort of
speculation frowned upon by this Court in Hooper [v. State]." (49) She contends that there is
legally insufficient evidence that she consciously disregarded a substantial or unjustifiable risk
that her girls would suffer grievous harm. She states that she "had left Mr. Bowden to baby-sit
while she was out during the evening and had no reason to suspect he was not trustworthy." (50) 
She also asserts that the evidence of causation was legally insufficient because her conduct,
standing alone, was "clearly insufficient" to cause her children serious bodily injury.

 There was absolutely no evidence that the children had ever fallen asleep in any
house with a candle left burning in the room. Nor was there any evidence that
there had ever been any safety problems or even a hint of injury to the children,
especially with candles, in the previous times the children had stayed at the
residence. It is also mere speculation by the appellate court that the jury could
have inferred that Bowden would not know what to do with the candle or that
Appellant assumed the role of making sure of extinguishing the candles in that
house. There are no facts to suggest that [appellant] would know Mr. Bowden
would move the candle down from a presumably "safe" place onto the floor
behind the bed and leave it burning. These actions, and failures to act, by a
person who had at least for the evening assumed an "in loco parentis" role,
supersede any contributions [appellant] made to the tragedy of that night." (51)

 

 We agree on both counts. First, there is legally insufficient evidence that appellant
consciously disregarded a substantial or unjustifiable risk that her children would suffer
serious bodily injury in a house fire if she took them from a house with utilities to one without
utilities. Viewed objectively, this act, either by itself or in combination with the State's second
act of alleged recklessness-leaving the girls in a room with a lit candle- does not involve a
"substantial and unjustifiable" risk of serious bodily injury or death. There is nothing
inherently dangerous about staying or sleeping in a structure that does not have utilities. 
Staying in a structure without utilities does not increase the likelihood of dying in a fire. 
Indeed, as noted by the court of appeals, the evidence shows the opposite: 

 As to the lack of utilities, Battalion Chief Holzer testified that the majority of
home fires the department responds to are in homes with utilities and that a
major concern for them is to make sure the utilities are turned off. And the fire
investigator agreed that electrical distribution equipment such as wiring, outlets,
and cords are the second leading cause of fire death and the third leading cause
of fires in the United States. Cooking fires are "number one." Only 15 percent
of fires in 2001 were attributable to open flames or embers. Fires can occur in
homes that have utilities; lack of utilities does not create an immediate chance
that there will be a fire. Sammy Beatty did not believe candles were inherently
dangerous and believed his girlfriend had some. Zula Mae admitted she had
scented candles in her house that she used sometimes even when children were
around. (52)


 If taking children to spend the night in a structure without utilities is conduct that
involves an extreme risk of danger for which one may be subject to criminal prosecution for
injury to a child should harm befall that child, the backwoods campers of the world are in
serious jeopardy. Any adult who lights a campfire that emits a spark that lands on a child's
pajamas and severely burns the child can be prosecuted as a felon. Scoutmasters beware. If
a Coleman gas lantern tips over and sets the children's pup tent ablaze, they might suffer the
same fate. The parent who uses a candle to read a bedtime story to the weary little camper may
rue the reading hour if the candle tips over and burns the child. Any of these harms might
befall a camper's child, but the act of camping in a site without utilities does not create such
a foreseeable substantial and unjustifiable risk of serious bodily injury or death that it suffices
to hold the camper's parent criminally liable should injury occur. Yet this act is precisely the
same as that alleged by the State in this case: taking a child from a house with working utilities
to one without them. 

 One could also pose the legal issue in the opposite manner: Would appellant have been
free from criminal liability had she done everything that she did do, but Bowden's duplex had
working utilities? After all, people who have electricity frequently use candles as well as, or
instead of, electric lights on various occasions. Zula Mae used candles even though her house
had light bulbs. But the law does not predicate a finding of criminal liability for creating an
unjustifiable and substantial risk of injury upon whether the actor used a candle out of
necessity (an act that purportedly creates a substantial and unjustifiable risk) or for aesthetic
purposes (a purportedly blameless act). 

 The State argues that appellant's act of taking the children from Zula Mae's house to
Bowden's was a reckless one because appellant ignored her mother's sage advice: "[I]t was too
dangerous to be taking them down there and burning candles." Alas, who among us has not been
guilty, from time to time, of ignoring our mother's wise words. In hindsight, of course, Zula
Mae proved to be a prescient Cassandra; the very harm that she had predicted did, in fact, occur. 
But merely because appellant failed to heed her mother's words does not mean that the act of
taking the children to Bowden's house (or camping outdoors for that matter) created a
substantial and unjustified risk of serious bodily injury to the girls. Appellant's "stupidity,
irresponsibility, thoughtlessness, [or] ordinary negligence" do not constitute reckless
disregard of a substantial and unjustified risk. A number of judicial decisions involving
criminal "gross negligence" or "recklessness" have held that warnings like that given to
appellant by Zula Mae do not suffice to establish the existence of a severe risk of injury or the
defendant's conscious disregard of such a risk. (53) The importance of such warnings must be viewed in light of the likelihood of their occurrence and magnitude of
the danger posed at the time the defendant acted, not in post-event hindsight. 

 Because we cannot conclude that the act of taking a child from a house with working
utilities to one without working utilities is the type of conduct that, by its nature, raises a
substantial and unjustifiable risk of injury, we hold that it cannot support a finding of reckless
injury to a child. (54) Thus, even if the State proved beyond all possible doubt that appellant did
take her children from a house with working utilities to one without, that fact cannot, either by
itself or in combination with other acts, support a finding of criminal recklessness under these
circumstances. (55)

 Therefore, we must consider whether appellant's act of leaving her two girls in a room
with a lit candle under Bowden's supervision could support a finding that she was criminally
reckless in causing her children's death. (56) This is an act that, by its nature and depending upon
the circumstances, could support a finding of recklessness-the conscious disregard of a
substantial and unjustifiable risk of injury. Were there such circumstances shown in this case? 
The court of appeals correctly stated, "It was undisputed that Appellant did not leave the girls
alone to sleep in the room with the candle burning but left them awake with Bowden in the
room to care for them, and there was evidence that he was trustworthy to care for the
children." (57) In fact, there was absolutely no evidence that Bowden was an incompetent or
uncaring babysitter. All of the evidence indicated that, in fact, he was a considerably more
responsible caretaker than appellant herself. (58) It is, as appellant asserts, "mere speculation by
the appellate court that the jury could have inferred that Bowden would not know what to do
with the candle or that Appellant assumed the role of making sure of extinguishing the candles
in that house." (59) There is nothing in the record to support this supposition that Bowden did not
know what to do with a lit candle. Blowing out a candle is not rocket science. And there is
nothing in the record to suggest that Bowden could not handle the task or did not care enough
to handle it. Quite the reverse. In hindsight, Bowden expressed great remorse and regret that
he did not blow out the candle when he went back in to check on the sleeping girls. He had left
it burning so that the girls would not be in the dark. In hindsight, this was obviously an unwise
decision; even at the time this was, perhaps, an unwise decision, but it does not prove he was
an incompetent caretaker or that appellant was actually aware that he was an incompetent
caretaker. A parade of State's witnesses had nothing bad to say about Bowden and much that
showed his conscientious character. (60) There is simply no evidence to suggest that Bowden, the "Johnny-on-the-Spot" babysitter, was in any way
incompetent. But the oddity of this case-the fact that appellant left the children in the care of
Bowden, who was not shown to be an unsuitable caregiver-makes it one of a kind. (61) That
difference takes this case out of the norm of reported fatal neglect cases. (62) On this record, we
cannot agree that appellant's leaving her children with Bowden in a room with a lit candle
represents a gross deviation from the standard of conduct that a law-abiding person in
appellant's situation would observe. The Texas Supreme Court has enunciated an appropriate
standard for civil cases involving reckless conduct which, applied here, asks: "viewed
objectively" from appellant's viewpoint, did her act or omission "involve an extreme degree
of risk, considering the probability and magnitude of the potential harm" to her two
daughters? (63) The acts that the State alleged and proved do not meet that threshold. This factual
situation-leaving Ujeana and Precious, 7-and 8-year-old girls, in bed with a lit candle upright
in a metal pan with Bowden nearby watching over the girls-is not one so inherently fraught with
danger as to create, in the mind of the objectively reasonable person, the awareness of a
substantial and unjustifiable risk of serious bodily injury. If appellant's conduct would not
suffice to raise a jury issue for imposition of punitive damages in a civil case, it is hardly
sufficient to raise a jury issue for a criminal conviction.

 For related reasons, we also agree that appellant is not "criminally responsible" for the
result in this case. Texas Penal Code § 6.04(a) provides, "A person is criminally responsible
if the result would not have occurred but for his conduct, operating either alone or
concurrently with another cause, unless the concurrent cause was clearly sufficient to produce
the result and the conduct of the actor clearly insufficient." (64) The court of appeals held that

 if Appellant had not taken the children to that house and put them to bed with the candle
burning that she, herself, had lit, or if she had at least been there to extinguish the candle
before the girls went to sleep as the evidence indicated she probably would have done,
the girls would not have died in the fire. Thus, we cannot conclude that Appellant's
conduct was "clearly insufficient," standing alone, to cause serious bodily injury and
death to the girls. (65) 

Under such a lengthy "but-for" chain of causation, however, one could trace that chain of
causation much further back in time, in fact, all of the way back to appellant's conduct of
meeting Charles Leon Williams, Jr., having an intimate relationship with him, bearing the two
girls, breaking up with Mr. Williams, and so forth. "But for" those acts, Ujeana and Precious
never would have been in Bowden's home or under his care on October 5, 2002. Obviously,
some element of foreseeability limits criminal causation just as it limits principles of civil
"proximate causation. (66) Criminal liability is predicated on "but-for" causation, and appellant's
acts are not a "but-for" cause of her girls' death unless that result is within the scope of the risk
of which she was aware. (67) Such would be the case if the intervening cause was reasonably
foreseeable on her part. But it was not. Bowden's act of falling asleep without blowing out
the candle was not reasonably foreseeable to appellant at the time she left. It was not
reasonably foreseeable that Bowden would move the candle. Nor was it foreseeable that a
sheet or clothing would then fall on the burning candle, or that Bowden would not be able to
get the children out of the house after a fire started. For the same reason that leaving the
children with Bowden did not represent a gross deviation from the standard of conduct that a
law-abiding person in the appellant's situation would observe, appellant's acts are not a "but-for" cause of the result in this case: there is nothing to suggest that Bowden was an
incompetent caretaker or that appellant, had she been there, would have prevented this tragedy. 


 The State argues that the "substantial, unjustifiable risk" was "foreseeable" because of
Zula Mae's warning. But failing to follow a prophetic warning does not suffice to establish a
foreseeably severe risk of harm. Mothers warn against improbable and unlikely dangers as well
as objectively obvious ones. The Texas Supreme Court has explained, in the analogous context,
"Extreme risk is a function of both the magnitude and the probability of the anticipated injury[,]
. . . the 'extreme risk' prong is not satisfied by a remote possibility of injury or even a high
probability of minor harm, but rather 'the likelihood of serious injury[.]" (68) Further, the severity
of the risk must be measured from the defendant's viewpoint at the time of the act or omission. 
As the supreme court explained in Moriel, 

 Determining whether an act or omission involves extreme risk or peril
requires an examination of the events and circumstances from the viewpoint of
the defendant at the time the events occurred, without viewing the matter in
hindsight. In every negligence or gross negligence case, some injury has
allegedly occurred. However, the magnitude of the injury may be entirely
disproportionate to the riskiness of the behavior. For example, inadvertently
dropping a wooden board into the metal hold of a ship may constitute
negligence, but cannot be gross negligence. This is so even though the board,
upon landing, triggers a Rube Goldberg chain reaction, eventually causing the
whole ship to explode. (69)


 Thus, even though appellant's act of leaving the girls with a lit candle in the room under
the care of Bowden may have, in a "Rube Goldberg" chain of events, ultimately led to their
demise, "it may nevertheless be the case that the behavior which caused it, viewed
prospectively and without the benefit of hindsight, created no great danger." (70) Here, as in
Moriel, the task in evaluating legal sufficiency of the evidence to support a finding of "gross
negligence" for civil lawsuit purposes (or "recklessness" for criminal liability) is to
"determine whether the proffered evidence as a whole rises to a level that would enable
reasonable and fair-minded people to differ in their conclusions." (71) Appellant cannot be liable
for a reckless injury to her children unless she was actually aware, at the time she left, of a
genuine and unjustifiable likelihood of serious harm to her children from leaving a lit candle
in the bedroom while her children were under Bowden's care. (72) Here, as in Moriel, the
evidence does not support (1) the inference that appellant had any subjective awareness that
her children would probably suffer serious bodily injury because of the lit candle in the
bedroom while under Bowden's care, or (2) the inference that appellant's action of leaving the
children under Bowden's care with the lit candle in the bedroom created a risk of serious harm
to those children. (73) Appellant's mother's warning was too general and unfocused to suffice to
raise a jury issue on either of these prongs. (74) Here, as in Jones, Riggs, Owens, and
McLaughlin, (75) the warnings given were too general and unfocused to establish that (1) the
mother was subjectively aware of the risk of a deadly accident, and (2) her actions created a
severe risk that such an accident would occur. 

 The State also argues that appellant is criminally responsible for this accident because
she "had the ultimate authority to make decisions on behalf of her children," and she had
alternatives: appellant could have left the children with either her mother Zula Mae, or the
girls' father, Charles Williams, Jr. Then they would have "had the usual amenities of a
functioning home." (76) This underscores what appellant maintains: "under the State's theory,
presumably appellant would have no culpability [and hence no criminal liability] for the girls'
deaths if they had perished in a fire from a lit candle in . . . [a] building with working utilities." (77)
 
Almost one third of the world lives, day in and day out, without electricity. (79) Are all of those
parents who live without electricity but who could send their children off to someone
else-another relative, a friend, nurses at an orphanage-who does have electricity criminally
liable when they do not do so and an accidental fire causes their children's death? Viewed in
a different light, what makes this scenario distinguishable from a family's camping venture in
which the cabin is lit only by firelight or candles and one parent leaves to go fishing while the
other supervises the sleeping children? Is the departing parent criminally reckless in leaving
the other parent with the children in a cabin with a roaring fire or a flickering candle? 

 There appear to be no reported cases in Texas (or any other state) of criminal
prosecutions in this scenario. We can find no case in which a parent was held criminally liable
for recklessly causing injuries to his child while that child was under the care of an apparently
competent babysitter. (80) Nor can we find any case in which the mere fact that either a parent
or a babysitter cares for children in an abode without electricity is, by virtue of that lack of
modern utilities, criminally reckless when an accident causes a fatal fire. (81) 

 As the court of appeals noted in this case, criminal prosecutions for tragic accidents
are inherently troubling. (82) They are also rare. (83) 

 Although we agree that "the decision to file criminal charge[s] is justifiable in cases
involving gross negligence because of its deterrent and expressive effects[,]" (84) the specific acts
alleged and proven by the State in this case do not support a finding of such gross negligence
amounting to recklessness on appellant's part. In the vast majority of cases, the issue of
whether the evidence supports a finding of culpable recklessness is a question for the jury. But
on occasion it becomes a question of law. (85) If the acts themselves do not pose a "substantial
or unjustifiable risk" that the harm will occur, or if that "extreme degree of risk" was not
actually foreseen by the defendant, or if the defendant's conduct was clearly not sufficient, by
itself, to result in the injury but the conduct of another was clearly sufficient, then the evidence
is not legally sufficient to submit the case to a jury or to sustain a conviction. We do not sit
as a "thirteenth juror" and disagree with the jury's finding that the appellant did the very acts
that the State alleged she committed. The jury followed the law as it was given to them. But
the State's allegations of the purportedly reckless acts committed by appellant are simply not
acts that, viewed objectively under these particular circumstances, involved "an extreme degree
of risk, considering the probability and magnitude of the potential harm to others." (86) Appellant
may have been a "bad" mother, unworthy of her mother, her children, and her boyfriend, but she
did not commit the crime of reckless injury to a child merely because she took her children
from a house with utilities to one without utilities, and left them, under the care of a
responsible adult, with a lit candle in the bedroom.

 In this case, the evidence of a criminally reckless mens rea and causation were legally
insufficient to sustain appellant's conviction. We thus reverse the court of appeals and order
an acquittal.


Delivered: October 3, 2007

Publish
1. Tex. Penal Code § 22.04(a). The offense of Injury to a Child, Elderly Individual, or
Disabled Individual, states, in pertinent part, "A person commits an offense if he intentionally,
knowingly, recklessly, or with criminal negligence, by act or intentionally, knowingly, or recklessly by
omission, causes to a child, elderly individual, or disabled individual . . . serious bodily injury."
2. Williams v. State, 190 S.W.3d 700 (Tex. App.-Fort Worth 2005).
3. Appellant's sole question for review reads:

 Did the court of appeals err in holding that the evidence presented against appellant was
legally and factually sufficient to support a conviction for recklessly causing serious
bodily injury to her children?

Because we find the evidence legally insufficient, we do not address the question of factual sufficiency. 
4. The evidence was mixed on who lit the candle. In his first statement, Bowden said he lit it,
and, in his second statement, he said appellant did. Appellant, in her statement, said that she lit it.
5. There were two interior doors into the bedroom. According to Bowden, one was open; the
other, which did not have a doorknob, was shut. This latter door opened inward, but the girls could not
open it, so they always used the other door. 
6. Bowden v. State, 166 S.W.3d 466, 470 (Tex. App.-- Fort Worth 2005, pet. ref'd). 
7. Williams, 190 S.W.3d at 714.
8. 443 U.S. 307 (1979).
9. Hooper v. State, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing Jackson, 443 U.S. at
318-19). 
10. Dewberry v. State, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999).
11. Hooper v. State, 214 S.W.3d at 13 (quoting Jackson, 443 U.S. at 318-19).
12. Tex. Penal Code § 22.04(a) (1) ("A person commits an offense if he intentionally,
knowingly, recklessly, or with criminal negligence, by act or intentionally, knowingly, or recklessly by
omission, causes to a child, elderly individual, or disabled individual . . . serious bodily injury").
13. Alvarado v. State, 704 S.W.2d 36, 39 (Tex. Crim. App. 1985).
14. See Cook v. State, 884 S.W.2d 485, 490-92 (Tex. Crim. App. 1994).
15. Tex. Penal Code § 6.03(c).
16. Tex. Penal Code § 6.03(d). See also Transportation Ins. Co. v. Moriel, 879 S.W.2d
10, 20 (Tex. 1994). In Moriel, the Texas Supreme Court discussed the legal standard for proving
entitlement to punitive damages for "gross negligence" and noted,

 Criminal negligence and recklessness differ from one another only in terms of mental
state. A criminally negligent defendant "ought to be aware" of a "substantial and
unjustifiable" risk, while a reckless defendant is subjectively aware of an identical risk
but disregards it. Importantly, nobody is subject to criminal punishment if they are
aware of a relatively minor risk or simply negligent.

 It should not be surprising that the civil definition of gross negligence and the
criminal definition of recklessness are virtually identical. Both serve the same
purpose-identifying when it is appropriate to punish an individual for consciously
disregarding an unjustifiable risk.

Id. 
17. Rollin M. Perkins and Ronald N. Boyce, Criminal Law 849 (3
rd ed. 1982). 

While it "is elementary that to support a conviction of crime, the accused must be guilty
of negligence in a higher and grosser degree than is sufficient to support a judgment in a
civil case," some difficulty has been encountered in expressing this greater fault, and the
trend has been in the direction of employing the word "reckless" for this purpose.

Id. at 846.
18. Id. at 850; see generally Pagotto v. State, 732 A.2d 920 (Md. Ct. Spec. App. 1999)
(discussing and distinguishing the varying degrees of civil and criminal negligence; evidence legally
insufficient to establish defendant's "gross negligence"); see also People v. Rodriguez, 8 Cal. Rptr.
863, 867 (Cal. Ct. App. 1960) ("in order to impose criminal liability for a homicide caused by
negligence, there must be a higher degree of negligence than is required to establish negligent default on
a mere civil issue. The negligence must be aggravated, culpable, gross, or reckless"; evidence legally
insufficient to establish gross negligence or recklessness) (quotations and citations omitted).
19. Lewis v. State, 529 S.W.2d 550, 553 (Tex. Crim. App. 1975).
20. People v. Carlson, 26 N.Y.S.2d 1003, 1005 (N.Y. County Ct. 1941).
21. Criminal recklessness is of "a gross and flagrant character, evincing reckless disregard of
human life, or of the safety of persons exposed to its dangerous effects; or that entire want of care
which would raise the presumption of [a conscious] indifference to consequences; or which shows such
wantonness or recklessness or a grossly careless disregard of the safety and welfare of the public, or
that reckless indifference to the rights of others, which is equivalent to an intentional violation of them." 
Cannon v. State, 107 So. 360, 363 (Fla. 1926) (quoting Florida South. Ry. Co. v. Hirst, 11 So.
506 (Fla. 1892) (applying definition used by civil courts to award punitive damages as the measure of
gross negligence for criminal manslaughter charges)).
22. Tex. Penal Code § 6.03(d) ("A person acts with criminal negligence . . . with respect to . .
. the result of his conduct when he ought to be aware of a substantial and unjustifiable risk that . . . the
result will occur.").
23. James Gobert, Searching for Coherence in the Law of Involuntary Manslaughter: The
English Experience, 6 Crim. L.F. 435, 454 (1995).
24. In Transportation Ins. Co. v. Moriel, 879 S.W.2d 10, 22 (Tex. 1994), the Texas Supreme
Court held that the evidence was legally insufficient to support a jury verdict that the defendant had
been grossly negligent for purposes of the imposition of punitive damages and explained, 

 Subjectively, the defendant must have actual awareness of the extreme risk created by
his or her conduct. Objectively, the defendant's conduct must involve an "extreme
degree of risk," a threshold significantly higher than the objective "reasonable person"
test for negligence. Extreme risk is a function of both the magnitude and the probability
of the anticipated injury . . . . [T]he "extreme risk" prong is not satisfied by a remote
possibility of injury or even a high probability of minor harm, but rather "the likelihood
of serious injury" to the plaintiff.

Id. (citations omitted). Our sister court summarized the two prongs of gross negligence or recklessness
as follows:

 (1) viewed objectively from the standpoint of the actor, the act or omission must involve
an extreme degree of risk, considering the probability and magnitude of the potential
harm to others, and (2) the actor must have actual, subjective awareness of the risk
involved, but nevertheless proceed in conscious indifference to the rights, safety, or
welfare of others.

Id. at 23. Courts have frequently employed the same definition of "gross negligence" used in assessing
punitive damages in civil cases to "recklessness" in criminal cases. The Florida Supreme Court
explained the rationale for doing so:

 While the kind of negligence required to impose criminal liability has been described in
different terms in different jurisdictions, it is uniformly held that it must be of a higher
degree than that required to establish simple negligence upon a mere civil issue and the
definition above quoted from former decisions of this court as to the character of
negligence authorizing punitive damages appears to be in line with the weight of
authority as to the character of negligence necessary to be shown to sustain criminal
liability. It stands to reason that the degree of negligence to sustain imposition of
imprisonment should at least be as high as that required for imposition of punitive
damages in a civil action.

Cannon, 107 So. at 363 (citing 29 C. J. 1154; 1 Bishop on Crim. Law (9th ed.) 216, 314.); see
also State v. Riggs, 2 S.W.3d 867, 871 (Mo. App. 1999) ("All of the authorities are agreed that, in
order to hold one a criminal, there must be a higher degree of negligence than is required to establish
negligent default on a mere civil issue") (internal quotations and citation omitted); Oregon v.
McLaughlin, 600 P.2d 474, 477 (Or. Ct. App. 1979) ("[W]e do not believe that the legislature
intended thereby to permit a lesser quantum of proof to go to the jury in a criminal case than would be
permitted in a civil case involving gross negligence.").
25. Gobert, supra note 23 at 461.
26. Moriel, 879 S.W.2d at 23; see also State v. Jones 151 S.W.3d 494, 499 (Tenn. Crim.
App. 2004) (when assessing the legal sufficiency of evidence to prove criminal negligence, "we must
view the circumstances 'from the accused person's standpoint'") (citation omitted); State v. Owens,
820 S.W.2d 757, 760-61 (Tenn. Crim. App. 1991) (legally insufficient evidence to prove criminal
gross negligence; "It is not sufficient to say, with 20/20 hindsight, that the appellant could have, or
should have, done some things differently. To affirm this conviction we must view the circumstances
under which the appellant acted and find she failed to perceive that her conduct presented an
unjustifiable risk to her child. The failure to perceive the risk must be a gross deviation from the
standard of care than an ordinary person would exercise under the circumstances.").
27. People v. Sikes, 159 N.E. 293, 297 (Ill. 1927); see also State v. Jones, 151 S.W.3d at
502 (stating that "ordinary negligence or inattention on the part of a mother does not rise to the level of
gross negligence, even if the mother's conduct contributes to the death of her child"); State v. Riggs, 2
S.W.3d at 871 (evidence was legally insufficient to support mother's conviction for involuntary
manslaughter involving the death of her child; stating that "mere inattention or mistaken judgment
resulting even in the death of another is not criminal unless the quality of the act makes it so") (internal
quotations and citation omitted).
28. Pagotto v. State, 732 A.2d 920, 924-25 (Md. Ct. Spec. App. 1999) (holding that
evidence was legally insufficient to support finding of defendant's "gross negligence" in involuntary
manslaughter trial; trial court should have granted motion for directed verdict).
29. Crume v. State, 658 S.W.2d 607, 609 (Tex. Crim. App. 1983). 
30. Lee v. State, 21 S.W.3d 532 (Tex. App.-Tyler 2000, pet. ref'd) ("reckless" to hold child's
feet stable under hot, running water for 30 to 45 seconds).
31. Cleburn v. State, 138 S.W.3d 542, 545 (Tex. App.-Houston [14th Dist.] 2004, pet. ref'd)
("a rational trier of fact could have found appellant to have been aware of, but have consciously
disregarded, the substantial risk that using his vehicle, a large pick-up truck, to move George's small
Toyota Tercel with a visible car seat and two adult occupants would result in bodily injury to anyone in
George's vehicle, including a child").
32. Torres v. State, 116 S.W.3d 208, 210 (Tex. App.-Corpus Christi 2003, no pet.)
(defendant acted recklessly when he grabbed and twisted infant's leg in anger while changing his
diaper).
33. Durkovitz v. State, 771 S.W.2d 12, 14-15 (Tex. App.-San Antonio 1989, no pet.)
(rejecting claim that evidence was insufficient to prove recklessness and listing eighteen pieces of
evidence that supported jury's determination, including "1) that a 350 pound grown lion is a dangerous
beast; 2) that appellant is an experienced animal trainer who knew the dangers presented by such a
beast; 3) that appellant was aware that the lion had injured two other children before this incident; 4)
that appellant knew that such a beast is instinctively attracted to attack smaller creatures, such as
children;" etc.).
34. LaSalle v. State, 973 S.W.2d 467, 474 (Tex. App.-Beaumont 1998, pet. ref'd) (defendant
who drove car at 50 m.p.h in a 35 m.p.h. zone and ran through numerous stop signs resulting in a
collision that injured his child passenger was reckless).
35. Compare Whitmire v. State, 913 S.W.2d 738, 740 (Tex. App.-Eastland 1996, pet.
dism'd) (evidence legally insufficient to support conviction for reckless injury to a child when evidence
did not show that appellant, who admittedly was intoxicated and drove recklessly, knew that there was
a child in car that he accidentally ran into).
36. Patterson v. State, 46 S.W.3d 294, 303-04 (Tex. App.-Fort Worth 2001, pet. ref'd)
(defendant recklessly caused serious bodily injury by failing to call 911 and identify her boyfriend as the
violent kidnapper of her children; a "reasonable juror could have found that the ability of law
enforcement authorities to immediately respond and restrict access to the city with minimal resources in
approximately seven minutes would have enabled them to intercept Woods before reaching the
cemetery road and prevented serious bodily injury to the children").
37. Kennerly v. State, 40 S.W.3d 718, 721 (Tex. App.-Waco 2001, no pet.) (defendant
caretaker at group home for disabled was reckless in leaving mentally and physically disabled woman
lying for a minimum of an hour in Clorox that defendant had poured in the hallway; defendant knew
Clorox was a hazardous material because she wore gloves when handling it ).
38. Ahearn v. State, 588 S.W.2d 327, 337 (Tex. Crim. App. 1979) (parents recklessly failed
to provide adequate food or medical care to their obviously emaciated four-month-old child; 

"When it became obvious that the child was losing weight and was in such a physical condition and
when the wounds became evident, appellants had a duty to seek medical care. The result of their failure
to do so no doubt caused a continuing decline in the baby's condition such that the jury was able to find
that appellants acted at least reckless[ly] or with criminal negligence.").
39. Payton v. State, 106 S.W.3d 326, 330 (Tex. App.- Fort Worth 2003, pet. ref'd)
(defendant recklessly caused child's injury when he failed to obtain reasonable medical care of his
grandson; "Based on the facts that appellant delayed seeking medical treatment for T.P. when the
medical evidence showed that T.P. had visible signs of distress, [defendant] had emergency medical
training, and [doctor] stated that it was possible that T.P. would have survived if he had received
medical care shortly after the injury occurred, the jury could have found that appellant acted recklessly
and grossly deviated from the standard of care that an ordinary person would have exercised under all
the circumstances as viewed from his standpoint.").
40. Prescott v. State, 123 S.W.3d 506, 510 (Tex. App.-San Antonio 2003, no pet.) (mother
reckless for failing to guard against drowning death of one of her four-year-old twins; "The testimony
of witnesses who, on numerous previous occasions, saw the girls wandering around the apartment
complex unsupervised [and returned them to their mother] is legally sufficient evidence of
recklessness.").
41. American Law Institute, Model Penal Code § 2.02, Comment 3, at 236.
42. Tex. Penal Code § 6.04(a) (Causation: Conduct and Results).
43. See generally, Robbins v. State, 717 S.W.2d 348, 351 (Tex. Crim. App. 1986).
44. Moriel, 879 S.W.2d at 23; see also Plummer v. State, 702 A.2d 453, 458 (Md. Ct. Spec.
App. 1997) (evidence legally insufficient to support automobile manslaughter conviction; "Only conduct
that is of extraordinary or outrageous character will be sufficient to imply" grossly negligent state of
mind); State v. Jones, 151 S.W.3d 494, 501 (Tenn. Crim. App. 2004) ("Tennessee courts have
sustained convictions for criminally negligent homicide only where the 'risk is of such a nature and
degree that injury or death is likely and foreseeable.'") (citation omitted). 
45. Williams, 190 S.W.3d at 714.
46. Id. at 713-14. The court reasoned that

 the record, viewed in the light most favorable to the verdict, supports the inference that
if Appellant had not taken the children to that house and put them to bed with the
candle burning that she, herself, had lit, or if she had at least been there to extinguish the
candle before the girls went to sleep as the evidence indicated she probably would have
done, the girls would not have died in the fire. Thus, we cannot conclude that
Appellant's conduct was "clearly insufficient," standing alone, to cause serious bodily
injury and death to the girls. 

Id.
47. Williams, 190 S.W.3d at 714.
48. Id. at 713-14. 
49. Appellant's Brief at 6; see Hooper v. State, 214 S.W.3d 9, 16 (Tex. Crim. App. 2007)
("Under the Jackson test, we permit juries to draw multiple reasonable inferences as long as each
inference is supported by the evidence presented at trial. However, juries are not permitted to come to
conclusions based on mere speculation or factually unsupported inferences or presumptions. . . . [A]n
inference is a conclusion reached by considering other facts and deducing a logical consequence from
them. Speculation is mere theorizing or guessing about the possible meaning of facts and evidence
presented. A conclusion reached by speculation may not be completely unreasonable, but it is not
sufficiently based on facts or evidence to support a finding beyond a reasonable doubt.") (footnote
omitted).
50. Appellant's Brief at 6.
51. Id. (citation omitted).
52. Williams, 190 S.W.3d at 716.
53. State v. Jones, 151 S.W.3d 494, 497-501 (Tenn. 2004) (finding legally insufficient evidence
to support mother's conviction for criminally negligent homicide of her two-year-old child who died
when passenger-side air bag deployed and broke child's neck after collision even though the State
showed (1) the mother had been verbally warned about child restraint law by hospital administrator and
was given a written pamphlet on car seat safety that stated, "never hold a child in your lap while riding
in either the front or back seat" and "be consistent! Always buckle your child in the safety seat," (2)
the rental car visor and seat belt contained explicit warnings that "Children 12 and under can be killed
by the air bag" and "ALWAYS use SEAT BELTS and CHILD RESTRAINTS," and (3) "during the
year prior to the accident, assorted public service announcements in print and television were circulated
regarding the importance of using child restraint seats"; although the defendant's "failure to heed these
warnings and to perceive the danger posed by sitting with her child on her lap in front of an air bag may
have been negligent, our cases illustrate that it simply does not rise to the level of gross negligence
necessary to uphold a conviction for criminally negligent homicide") (citation omitted) ; State v. Riggs,
2 S.W.3d 867, 868, 872, 875 (Mo. Ct. App. 1999) (evidence legally insufficient to support
defendant's conviction for involuntary manslaughter for the drowning death of her two-year-old son;
although landlord had warned defendant not to let her children go beyond the last mobile home in the
park because "there was an open basement and an unfenced duck pond located about 80 feet from
that last trailer," defendant's conduct of being "inert, inactive, and languishing in front of a movie" for 45
minutes while her children played outside "did not manifest a conscious disregard of a risk of death to
her child." The court noted that defendant's "conduct included nothing intentional. She did not commit
overt acts that would blatantly harm a child. Her omission to watch her children on the steps of her
home for a forty-five minute period did not make it substantially certain that her two-year-old son
would wander to his death. The pond was 628 feet away from her home with more than 8 homes
between [defendant's] home and the pond."); State v. Owens, 820 S.W.2d 757, 760-61 (Tenn Crim.
App. 1991) (finding legally insufficient evidence to support mother's conviction for criminally negligent
homicide of her eleven-month-old daughter who died of bronchitis and pneumonia; (1) defendant's
primary care physician had warned her that taking her disabled daughter into public places would
expose her to a great risk of infection and the mother regularly took daughter out with her, and (2) the
State "presented several other witnesses who related incidents in which the care the appellant gave to
[her daughter] did not conform to the instructions given by the doctors[,]" but these acts amounted to
no more than "some carelessness and negligence," and did not rise to the level of gross negligence
which requires proof of a gross deviation from the required standard of care); State v. McLaughlin,
600 P.2d 474, 475-77 (Or. Ct. App. 1979) (finding evidence legally insufficient to support defendant's
conviction for child neglect in the death of her newborn baby who died when her husband hit the baby
while babysitting him even though (1) father had a well-known violent temper and a history of
assaulting their children and was, at the time of the baby's death, awaiting trial for assaulting their six-year-old daughter while babysitting her, and (2) State offered evidence that caseworker for Children's
Services Division had warned the mother that a "'high risk situation' could exist if the daughters were
around the husband and also after a new baby would come into the home"). In McLaughlin, the court
stated that the case never should have been submitted to the jury on the issue of criminal negligence: 

 The statutes describing the offense and the definition of the standard of care together
required that before this charge could have been submitted to the jury there had to be
evidence from which it could fairly have been found: (1) that the act of the mother in
leaving the child in the care of his father while doing an ordinary family chore was done
without recognition of a high degree of likelihood that he would cause an injury to the
child; and (2) that the failure to recognize that likelihood was different in an
extraordinary way from what others would have done in similar circumstances. Even
given the husband's record of bad temper and violence toward her and one of the older
children, and the warnings of the caseworker, the evidence was not sufficient to permit
a finding that the mother failed to recognize the degree of risk to the extent that any
reasonable person would have done. 

600 P.2d at 477.
54. According to USAID, two billion people worldwide lack access to affordable and reliable
energy supplies. See Testimony of the Alliance to Save Energy Submitted to the House
Appropriations Subcommittee on Foreign Operations 2007 Appropriations for USAID's Energy
Programs, March 31, 2006 (available at http://www.ase.org/content/article/detail/3046) (last visited
September 20, 2007). The world's population is currently 6.6 to 6.7 billion. See
http://www.census.gov/ipc/www/popclockword.html (last visited September 20, 2007). Thus, nearly
one in three people in the world go to sleep as did Ujeana and Precious Williams-by candle light, gas
light, fire light, or no light at all. 
55. One can, of course, imagine some circumstances in which this act could give rise to a finding
of a substantial and unjustifiable risk. Suppose, for example, that we are back in the early 1950's and
appellant's child had polio requiring her to be in an iron lung. The iron lung is powered by electricity,
which is used to continuously assist her to breathe. Detaching the child from her source of electricity
and taking her to a structure without electricity, while actually aware that it is the iron lung that sustains
her child's life, would constitute a substantial and unjustifiable risk of injury.
56. The court of appeals noted that

 it was undisputed that Appellant did not leave the girls in the room alone to sleep with the
candle burning, but that Bowden had agreed to and did stay with the girls. Bowden was in the
room with Appellant when she lit the candle before she left the second time, and Bowden was
in the back room with the girls when Appellant left.

190 S.W.3d at 714-15.
57. Williams, 190 S.W.3d at 716.
58. As the court of appeals stated, 

 There was evidence that Appellant could have trusted Bowden to take care in keeping
the girls that night. Bowden and Appellant had been seeing each other for about four
years. Charles Williams and Sammy Beatty both testified that Bowden seemed to be a
friend to the girls and Beatty recalled that he sometimes heard them call him "Dad."
Beatty had known Bowden for many years, since they were kids. Beatty owned two
houses on Dallas Street, including the one next door to the structure Bowden was
staying at. Beatty was remodeling it and Bowden was helping him. Bowden also had
started working at Bennigan's with Beatty, so they worked together almost every day.
Beatty recalled that Bowden would get food for the girls at Bennigan's almost every
day.

Id. at 715. The court of appeals also stated, 

 In his second statement, Bowden elaborated that the girls were just like his own
children to him. He spent his money on them, and his time with them. Zula Mae had
complained to him how much he baby-sat the girls when Appellant would go places. 
The girls were always a number one priority for him. There was no evidence that
Bowden used drugs or alcohol that night. The jury could reasonably have concluded
that Appellant did not act recklessly in leaving the girls in Bowden's care with the
candle still burning.

Id. (footnote omitted).
59. Appellant's Brief at 6.
60. See Williams, 190 S.W.3d at 714-15. For example, appellant's mother, Zula Mae Scott,
agreed that the children liked to spend time with Mr. Bowden:

Q Okay. Is it a fact that Mr. Bowden spent a lot of time with the children over the years?

A Yes. When they was with their mother and him.

****

Q Okay. Do you have any facts which would support a conclusion that he set out to hurt the
children?

A No, I don't.

****

Q Okay. And I understand this is hard to gauge, but did the children seem to enjoy going over to
visit [Mr. Bowden] with their mother?

A Yeah, they was happy to be with their mother.

Q At Ronald's residence?

A I - at anywhere their mother was at, they would like to be with her.


 Charles Leon Williams, Jr., the father of the two girls, testified he had no issue with Mr.
Bowden-

Q And - and did you know Ron was hanging around last fall with Sharan?

A Yes, ma'am.

Q Did you-did you know Ron?

A Yes, ma'am.

Q And about how long have you known Ron?

A I've known him for some years.

****

Q Was there any animosity between you and Ron?

A No, ma'am. We worked together a couple of times.

Q Okay. You didn't have a problem with the fact that your ex was-was dating someone else?

A No, ma'am.

****

Q Okay. . . .Mr. Williams, would you have gone and gotten the girls that night had you known
they were not at home?

A Yeah. She would told me to go get them somewhere. I would have picked them up.

Q You had a vehicle you were driving?

A Yes, ma'am.

****

Q And you wouldn't have had any problems with Ron as far as any animosity or ex-spouse kind
of thing going on there?

A No, ma'am.

Q You could have gotten the girls and take them back to your place?

A Yes, ma'am.

****

Q . . . Last series of questions, you had worked with Ron, there wasn't any-worked with Ron,
there wasn't any problems. Fundamentally did you think of him as a good guy?

A I knew him as a friend.

Q As a friend. You don't have any doubt in your mind that Ron-Ron set out to hurt your
children, do you? You don't think he wanted to hurt Precious or Ujeana?

A No. Ain't nobody want to hurt them.

Q Okay. Do you think of it as an accident?

A Fire started accidentally.


 In addition, appellant's neighbor Lee Sammy Beatty, testified favorably about Mr. Bowden. 
Mr. Bowden often worked for Mr. Beatty, at Bennigan's, and also on a remodeling job. He'd known
Mr. Bowden since he "was a kid."

Q . . . You have no reason to believe or no fact that you can provide to the jury that would sustain
a belief that he wanted to hurt the kids-

A No.

Q - is that correct?

A No.

Q And indeed, you believe quite the opposite-

A Right.

Q - is that correct?

A Yeah, those kids were fine.

Q Those kids were fine. Did-to the best of your recollection, did [Ron] used to sometimes get
food at Bennigan's to give to the children?

A Just about every day. But - 

Q Go ahead.

A I-I'd get on him. Hey, you're not supposed to do this. But they're for the kids, so-

Q Considering the circumstances?

A You know, I didn't have no problem with it. I did, but didn't at the same time.

Q Right. You don't think he intentionally wanted to hurt the children, do you?

A No way.


Mr. Beatty also noted that he did not think a residence became inherently unsafe once utilities were shut
off:

Q . . . You alluded to in your childhood there were times when you essentially had to do without?

A Yes. Stuff didn't get paid, stuff got cut off.

***

Q So there might be a period there, a few days, even a few weeks, where you're without
electricity or without gas?

A Yeah. It can happen to anybody.

Q Exactly? It can happen to anybody. Would you have considered your house to be inherently
unsafe because you didn't have gas or electricity during that time?

A No. No. Still home to me.

Q In this particular house where Ron was living at back there, you wouldn't have been interested
in adding on to your house unless you felt it was a well-built, solid structure?

A Right.

Q Would you have had any problem staying there yourself-

A No.

Q - in that house? 

A No.


These were all State's witnesses. The State put on no "bad character" witnesses.
61. There was no evidence Bowden was drunk, "high," or otherwise incapacitated. Contra
Bohannon v. State, 498 S.E.2d 316, 320-23 (Ga. Ct. App. 1998) (sufficient evidence to support
manslaughter conviction when defendant, while in a drunken state, took her infant "from the safety of a
babysitter," and placed the baby in bed with her and the baby's father, who she knew was also
intoxicated, and, in a drunken sleep, rolled on top of their child and asphyxiated her). And there was
no evidence that appellant had any reason to suspect that Bowden was an unfit caretaker. See e.g.,
Rayzor v. United States, No. 96-2100, 1997 U.S. App. LEXIS 18194, *5-6 (1st Cir. July 22, 1997)
(not designated for publication) (affirming the grant of Navy's motion for summary judgment against
parents who sued on behalf of their daughter, who was allegedly abused by a babysitter whom the
parents hired from a list of sitters recommended by the Navy; no evidence "that the Navy lacked due
diligence in failing to investigate the individuals whose names appeared on the list. They cite to no
incidents of child abuse involving Red Cross sitters generally, or concerning the specific individuals on
the list at the base").
62. See generally Jennifer M. Collins: Crime and Parenthood: the Uneasy Case for
Prosecuting Negligent Parents, 100 Nw. U.L. Rev. 807 (2006). Professor Collins identified general
trends in part by studying reported judicial decisions involving fatal parental negligence. She found only
ninety-two such decisions nationwide and categorized them as: (1) failure to provide (such as food,
water, or medical care), (2) failure to supervise, and (3) failure to intervene (to protect a child from the
abuse or neglect of another adult). Id. at 818. She noted,

 The reported case survey showed, as I expected, that a very significant percentage of
the cases involved a failure to provide for a child, especially medical care. Forty-three
cases primarily involved a failure to provide for the child. In twenty-four of those
forty-three cases, the charges against the parent primarily involved a failure to provide
timely medical care. Twelve of the remaining cases involved a failure to provide
nourishment and six involved a failure to provide both. Another case, in which a
four-day-old baby was attacked and killed by a swarm of fire ants, involved a failure to
provide safe conditions. Only thirteen of the ninety-two cases included an allegation
that the death was caused by a failure to intervene to protect a child from abuse by
another individual, probably because this is still a relatively new legal development.

 In thirty-four of the ninety-two cases, the parent or guardian was prosecuted
because of a failure to provide adequate supervision. Thus, prosecution in failure to
supervise cases is certainly not unprecedented. The most common causes of death
were as follows: twelve cases involved accidental drowning, which resulted either from
children being left unattended in a bathtub or from children being left unsupervised,
allowing the children to wander outside and drown in a pool or other water hazard;
eleven cases involved leaving young children home alone, who died when a fire broke
out in their residence; and seven of the remaining cases involved deaths in automobiles.

Id. at 818-19 (footnotes omitted). 
63. Transportation Ins. Co. v. Moriel, 879 S.W.2d 10, 22 (Tex. 1994) (holding that evidence
of defendant's allegedly "reckless" conduct was legally insufficient to support award of punitive
damages in civil lawsuit).
64. Tex. Penal Code § 6.04(a).
65. 190 S.W.3d at 713-714.
66. See American Law Institute, Model Penal Code § 2.03, Explanatory Note at 254-55
(stating that but-for causation is not sufficient by itself, and stating, "Liability is predicated on but-for
causation, subject to limitations based on the relationship between the risks created by the actor's
conduct that support a finding of recklessness or negligence and the consequences that in fact ensued"),
see also id. at 263-64 (discussing offenses in which recklessness or negligence is the required
culpability and in which the actual result is not within the risk of which the actor was aware or, in the
case of negligence, of which he should have been aware), id. at 265 n.24 (discussing a federal draft
provision on criminal causation that left limitations on "but-for" causation "to judicial development of the
concept of proximate cause"; stating that Texas had enacted a variation of the federal draft which,
"[t]aken literally . . . would imply that but-for causation alone is ordinarily sufficient for liability, subject
only to qualification with respect to concurrent causes," and noting that "[t]he same error occurs in the
Alabama Code").
67. See, e.g., People v. Warner-Lambert Co., 414 N.E.2d 660 (N.Y. Sup. 1980). In
Warner-Lambert, four corporate officials were indicted for second-degree manslaughter and negligent
homicide. The defendants operated a chewing-gum factory and had been warned that dust build-up
created a hazard of explosion. Sometime after the warning, but before the defendants had taken
significant steps to remedy the situation, a spark ignited an explosion that killed six employees. The
court of appeals dismissed the indictments before trial because the facts, as alleged, were insufficient to
prove that the defendants' conduct caused the deaths. Although [the defendants] were aware that there
was a broad, undifferentiated risk of an explosion in consequence of ambient magnesium stearate dust
arising from the procedures employed in its manufacturing operations, the corporate and individual
defendants may nonetheless not be held criminally liable, on the theory of either reckless or negligent
conduct, for the deaths of employees occasioned when such an explosion occurred where the triggering
cause thereof was neither foreseen nor foreseeable.

414 N.E.2d at 661.

 Analogized to the present case, it is not sufficient to prove that leaving a lit candle in a bedroom
could cause a fire that causes the death of children. It is the general chain of events that did actually
occur which must have been at least reasonably foreseeable. See id., 414 N.E.2d at 666
(distinguishing scenario in which the defendant had abandoned the victim on a roadway and the
foreseeable chain of events that led to that victim's death; "We subscribe to the requirement that the
defendants' actions must be a sufficiently direct cause of the ensuing death before there can be any
imposition of criminal liability, and recognize, of course, that this standard is greater than that required to
serve as a basis for tort liability. Thus, [in the prior case] we were concerned for the nature of the chain
of particularized events which in fact led to the victim's death; it was not enough that death had
occurred as the result of the defendants' abandonment of their helpless victim.") (internal quotations
omitted; citation omitted).
68. Transportation Ins. Co. v. Moriel, 879 S.W.2d 10, 23 (Tex. 1994).
69. Id. (footnote omitted).
70. Id.
71. Id. at 25.
72. Id.
73. Id.
74. See, e.g., General Motors Corp. v. Sanchez, 997 S.W.2d 584, 596-97 (Tex. 1999) (car
manufacturer's consumer warning concerning possibility that car "not fully in Park" could "move
suddenly" and be dangerous did not allow an inference that G.M. consciously decided to downplay the
"mis-shift danger" or "provide a reasonable basis upon which to infer conscious indifference"; legally
insufficient evidence to support a finding of gross negligence for purposes of punitive damages).
75. See note 53 supra.
76. State's Brief at 8-9, 15.
77. Williams, 190 S.W.3d at 710. (78)
78. 100 Nw. U.L. Rev. at 854 ("Moreover, another reason we are so reluctant to prosecute
in failure to supervise cases in particular is undoubtedly because these incidents are just as likely
to occur in upper-and middle-income families as in poorer ones. If we are reluctant to view
harms committed against children as criminal acts, we are even more reluctant to do so when the
harmful act is committed in a home typically viewed positively by both society at large and the
criminal justice system. 216 This bias in favor of homes and parents traditionally considered
"good" is evident in a number of ways throughout the criminal justice system. For example, at
the time of sentencing, "courts may assume that white middle-class mothers are both more
amenable to nonjudicial social controls and more needed in the home by their children than other
groups of mothers." 217 Indeed, the fact that so many of these [*854] cases involve the father as
the responsible party is probably another factor in our hesitance to prosecute as well. We are far
more forgiving of paternal mistakes in childrearing than maternal ones. 218



79. See supra note 54. 
80. In civil law, a babysitter owes a child due or reasonable care. See Restatement (Second)
of Torts, § 324 (Duty of One Who Takes Charge of Another Who Is Helpless).

 One who, being under no duty to do so, takes charge of another who is helpless
adequately to aid or protect himself is subject to liability to the other for any bodily
harm caused to him by (a) the failure of the actor to exercise reasonable care to secure
the safety of the other while within the actor's charge, or (b) the actor's discontinuing
his aid or protection, if by so doing he leaves the other in a worse position than when
the actor took charge of him.

Id.; see also id.,Comment B ("It applies also to one who takes charge of another who by reason of his
youth is incapable of caring for himself"); Standifer v. Pate, 282 So. 2d 261, 265 (Ala. 1973)
("defendant under-took to supervise, watch and care for plaintiff. By undertaking to perform these
services, defendant binds himself to the exercise of due care in their execution, irrespective of
compensation"); Zalak v. Carroll, 205 N.E.2d 313, 313 (N.Y. 1965) ("Even without compensation,
when defendants undertook to control a young child and provide care for her, they became responsible
for her injury through their negligence.") (citations omitted); Whitney v. Southern Farm Bureau
Casualty Ins. Co., 225 So. 2d 30, 33 (La. Ct. App. 1969) ("As a general rule, a person who
undertakes the control and supervision of a child, even without compensation, has the duty to use
reasonable care to protect the child from injury. Such person is not an insurer of the safety of the child. 
He is required only to use reasonable care commensurate with the reasonably foreseeable risks of
harm").

 In one case, a mother was held to have breached her duty of exercising reasonable care when
she left the child with a babysitter. In Chicago & N. R. Co. v. Schumilowsky, 8 Ill. App. 613 (1881),
the court found a mother, who had left her child with a sitter while she went to the store, was at least
culpably "negligent." The child, apparently under the care of his uncle, strayed out of the house and
was sitting by the side of a railroad track when a train struck and killed him. Id. at 613. The mother
sued the railway company for the child's death, but did not recover: "The proof shows, either that the
mother left the child in the care of its uncle, or if not in his care, then in the care of no one, and it is
immaterial which. If left in the uncle's care he gave it no attention, and permitted it to go at large; and
this, under the circumstances, was culpable negligence. If the mother went away leaving the child in the
care of no one, it was equal negligence on her part." Id. at 619. Here, the mother was held civilly
negligent, not criminally reckless, in contributing to her son's death.
81. See People v. Rodriguez, 186 Cal. App.2d 433, 438 (Cal. App. 1960) (evidence legally
insufficient to support the defendant's conviction for manslaughter when she left her four small children
alone at home for several hours, and an accidental fire of unknown origins burned her house down and
caused the death of one of her children).
82. Williams, 190 S.W.3d at 717 ("This is a troubling and tragic case. Poverty and having to
'do without' is not a crime, but Appellant had choices she chose to disregard."). One commentator has
noted a "particularly important-and disturbing," trend in one empirical study: that "parents in blue
collar professions and parents who were unemployed were four times more likely to be prosecuted
than parents from wealthier socioeconomic groups" for fatal accidents involving children. See Collins,
100 Nw. U.L. Rev. at 809. Professor Collins set out the results of an empirical study examining
prosecutorial charging decisions over a six-year period in cases involving children who died of
hyperthermia when left alone in motor vehicles and noted:

 One of the most striking trends in the data was the preferential treatment accorded
parents who could be identified via descriptions contained in media reports as middle or
upper class or employed in "white collar" professions. I was able to obtain information
regarding both socioeconomic status and prosecution outcome for fifty-one of the cases
involving parents as potential defendants. Thirty of these cases involved parents who
could be characterized as working in a white collar profession or as being the spouse of
a white collar professional. Professions ranged from a NASA scientist to college
professors to a hospital CEO. Of these individuals, only seven were prosecuted, for a
prosecution rate of 23.3%. But of the twenty-one individuals who could be classified
as working in a blue collar profession or who were unemployed, or had some other
indicator of a lower socioeconomic status such as living in a mobile home with no
working utilities, eighteen were prosecuted, translating to a staggering prosecution rate
of 85.7%. 

Id. at 831-32 (footnotes omitted). By comparison, when San Antonio's Senator Frank Madla, his
wife's mother, and his grandchild died in a house fire caused by candles lit in celebration of
Thanksgiving, no one was prosecuted. Lomi Kriel, Madla, Grandchild Reunited in Death, San
Antonio Express-News, Nov. 26, 2006, at 1B.( "Dozens of candles had been lit in the living room and
in the backyard during the Madlas' Thanksgiving celebration and, although they had been blown out,
they had likely caused the fire[.]"). Instead, Texas legislators responded by drafting the "Senator
Frank Madla Act" requiring smoke detectors in homes. Gary Scharrer, Senate OKs Madla Act
Unanimously, San Antonio Express-News, Apr. 27, 2007, at 11A.
83. Published opinions dealing with prosecutions for accidental fires are few and far between. In
People v. Albers, 672 N.W.2d 336 (Mich. Ct. App. 2003), a conviction of involuntary manslaughter
based on a fire started by the defendant's six-year-old child was upheld. The child had found a
cigarette lighter underneath a sofa cushion, jumped onto a kitchen counter and grabbed a candle from
the top of the refrigerator, then took the candle and lighter to the defendant's bedroom and lit the
candle. Id. at 338. Shortly thereafter, "the bedroom curtains caught fire, and the fire eventually spread
throughout the apartment complex," killing a neighbor's baby. Id. The court held the evidence
sufficient because the prosecution proved that: 1) the child was a known fire starter, 2) the defendant
was aware of that fact and had been repeatedly warned to keep all flammable materials and incendiary
devices (including cigarette lighters) out of the child's reach, and 3) that the defendant had refused to do
so, stating that she was "'not going to live like that,' and '[her children] know better than to play with
matches or lighters.'" Id. at 339. 
84. Collins, 100 Nw. U.L. Rev. at 811. 
85. See Jones, 151 S.W.3d at 503 (evidence legally insufficient to support mother's conviction
for criminally negligent homicide because her conduct did not constitute a gross deviation from the
standard of care); Riggs, 2 S.W.3d at 875 (evidence legally insufficient to support mother's conviction
for involuntary manslaughter because facts and circumstances were not sufficient to establish gross
negligence or show a conscious disregard for human life); Owens, 820 S.W.2d at 760-61 (evidence
legally insufficient to support mother's conviction for criminally negligent homicide because her
carelessness and negligence did not rise to the level of gross negligence); McLaughlin, 600 P.2d at 477
(evidence legally insufficient to support mother's conviction for child neglect because the "evidence was
not sufficient to permit a finding that the mother failed to recognize the degree of risk that any
reasonable person would have done"); see also People v. Angelo, 159 N.E. 394, 396 (N.Y. 1927)
("Under a given state of facts, whether negligence is culpable is a question of judgment. Ordinarily for
the judgment of the jury, as is the question whether negligence exists at all. But in the one case as in the
other it may become a question of law. If the negligence is so slight as not to reach the required
standard the court should advise an acquittal of the accused."); People v. Rodriguez, 8 Cal. Rptr. 863,
869 (Cal. App. 1960) (evidence legally insufficient to support manslaughter conviction when "[t]here
was no evidence from which it can be inferred that defendant realized her conduct would in all
probability produce death. There was no evidence as to the cause of the fire, as to how or where it
started. There was no evidence connecting defendant in any way with the fire. There was no evidence
that defendant could reasonably have foreseen there was a probability that fire would ignite in the house
and that Carlos would be burned to death. The most that can be said is that defendant may have been
negligent; but mere negligence is not sufficient to authorize a conviction of involuntary manslaughter.");
Pagatto v. State, 732 A.2d 920, 925, 969 (Md. Ct. Spec. App. 1999) ("In a case charging
involuntary manslaughter of the gross negligence variety, as we graduate upward, the State will not be
permitted to take its case to the jury simply by proving a prima facie case of ordinary negligence. It
must meet an additional and higher burden of production by showing such gross negligence, above and
beyond mere civil negligence, as to evidence 'a wanton or reckless disregard for human life.' There are
a number of cases where ordinary negligence has been established or assumed but where the evidence
was nonetheless held, as a matter of law, to have been legally insufficient to have permitted the jury
even to consider a manslaughter verdict based on gross criminal negligence. . . . We hold that the
evidence was not legally sufficient to permit a finding of gross criminal negligence on the part of the
appellant and that the charge of manslaughter, therefore, should not have been submitted to the jury. . .
. Alternatively, we hold that the evidence was not legally sufficient to permit a finding that any action of
the appellant, even if assumed to have been grossly negligent, was the proximate cause of the
decedent's death and that the charge of manslaughter, therefore, should not have been submitted to the
jury.").
86. Transportation Ins. Co. v. Moriel, 879 S.W.2d 10, 23 (Tex. 1994).